Lawrence HANNAN, Mary Hannan, and Jennifer Wilhite, Appellants–Plaintiffs,

v.

PEST CONTROL SERVICES, INC., a/k/a/ "PESCO," et al., Appellee–Defendant.

No. 49A02–9908–CV–560.

Court of Appeals of Indiana.

Aug. 31, 2000.

Rehearing Denied Oct. 27, 2000.

Joseph A. Thomas, Thomas Law Office, Indianapolis, Indiana, David S. McCrea, McCrea & McCrea, Bloomington, Indiana, Attorneys for Appellants.

H. Patrick Morris, Johnson & Bell, Chicago, Illinois, Lloyd R. Milliken, Locke Reynolds Boyd & Weisell, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

BAKER, Judge

Appellants-plaintiffs Lawrence Hannan, Mary Jane Hannan and Jennifer Wilhite (collectively, the plaintiffs) appeal the trial court's entry of summary judgment in favor of appellee-defendant Pest Control Services, Inc. (PESCO). Specifically, the plaintiffs contend that the trial court improperly excluded the testimony of certain expert witnesses regarding their negligence claim against PESCO. The plaintiffs urge that those witnesses were fully qualified to testify regarding pesticide poisoning and maintain that the trial court's exclusion of that testimony constituted an abuse of discretion. Moreover, the plaintiffs contend that the cleaning of the residence after pesticide chemicals had been sprayed constituted a spoliation of the evidence by PESCO and that the trial court erroneously dismissed the "independent" causes of action for emotional distress and property damage. Appellant's brief at 36–39.

### FACTS

On June 14, 1993, Steven Gaylord, an employee of PESCO, arrived at the Hannans' Indianapolis home to spray for ants. The Hannans were selling their residence and were planning to purchase a larger home. The Hannans contacted PESCO because a portion of their home had become infested by the insects.

Shortly after the residence was sprayed, the plaintiffs re-entered the home. While there was no detectable odor the Hannans claimed that they, their two-year-old daughter Kaitlyn and Jennifer Wilhite, who was Mary Jane's sister, became ill with flu-like symptoms. Rebecca Morgan, who was Kaitlyn's babysitter, also exhibited symptoms of the flu. Most of the plaintiffs did not seek medical attention until June 23, 1993. Wilhite did not seek any

medical attention for her alleged pesticide exposure until September 3, 1993. It was revealed that Wilhite's medical history prior to the alleged exposure included benzene intoxication in 1977, headaches since 1964, dizziness, spots before the eyes, pain behind the eyes, sinus trouble, recurrent sore throats and nausea. Wilhite was treated for headaches in 1989, which she had been experiencing for three to four months. In 1991, she was treated for depression which she believed might have been caused by toxins at the chemical factory where she worked. Just twelve days prior to the alleged pesticide exposure, she was seen for a throat infection that had been recurring for three years.

Characteristic signs of acute overexposure to organophosphates to which the plaintiffs were allegedly exposed include salivation, urination, diarrhea, pin-point pupils and gastrointestinal symptoms. Such symptoms occur almost immediately and disappear or subside over a period of days. None of the plaintiffs reported these symptoms until June 21, 1993, which was one week after the alleged exposure had occurred. Moreover, the symptoms the plaintiffs reported were random and nonspecific.

On June 21, 1993, the Hannans were directed by PESCO's insurance carrier, Zurich American Insurance Company (Zurich), to vacate their residence. Zurich then contacted ServiceMaster to clean the Hannans' home. Even though a representative of ServiceMaster became sick while evaluating the house for cleaning, its employees found no trace of any hazardous chemicals. After the home was cleaned, Zurich paid ServiceMaster a total of $5,587.57 for the remediation of hazardous chemicals. Although a clean air machine ran for nearly two weeks in the house, Mary Jane Hannan and Jennifer Wilhite became ill within minutes after returning to the home. Zurich paid nearly $160,000 in living expenses for the family to live in hotel rooms and rental homes. Pursuant to an investigation conducted by Zurich, the company determined that the illnesses complained of by the plaintiffs could not have resulted from exposure to the pesticides that PESCO used when spraying the house.

On September 16, 1994, Zurich terminated the payments, and the Hannans ultimately sought bankruptcy protection. The real estate company refused to re-list the residence for sale. As a result, on July 16, 1996, the plaintiffs filed an amended complaint for damages against PESCO.[1] They alleged, *inter alia*, that PESCO was negligent with respect to the type and amount of chemicals that were used in spraying the residence. The complaint requested compensatory damages, punitive damages and costs of the action.

Thereafter, on April 5, 1999, PESCO moved for summary judgment claiming that no genuine issue of material fact existed regarding the plaintiffs' claims that exposure to the chemicals caused any of their injuries. PESCO also filed a motion to exclude the plaintiffs' medical causation expert witnesses. That motion alleged in relevant part as follows:

> Plaintiffs' experts have failed to utilize the generally accepted toxicological cause-and-effect methodology, their methods and opinions are not generally accepted in the scientific medical community, they do not constitute scientific knowledge and are inherently unsound and unreliable. In addition, Plaintiffs' experts have failed to negate other potential causes of Plaintiffs' alleged illnesses.

R. at 5080. On June 3, 1999, the trial court heard oral argument with respect to PESCO's motions. The matters were taken under advisement and on July 1, 1999, PESCO filed a second motion for summary judgment on the issue of liability. Thereafter, the trial court entered its judgment,

---

1. The plaintiffs also named the DowElanco company as a defendant. By agreement, DowElanco was subsequently dismissed from the action.

findings of fact and conclusions of law on July 16, 1999. Specifically, it was determined that the testimony offered by the plaintiffs with respect to the issue of medical causation was inadmissible under Ind. Evidence Rule 702 and common law. The trial court further determined that establishing medical causation for the injuries claimed by the plaintiffs was an essential element of each cause of action that was pled, and that the failure to submit competent and admissible evidence on this issue, or evidence from which an inference of causation could be made, entitled PESCO to summary judgment. The trial court noted that "no treating physician as demonstrated has set forth sufficient facts, knowledge or expertise to allow them to testify to causation." Appendix at 1.

The plaintiffs' purported experts sought to testify that the plaintiffs suffered from various ailments because of their alleged exposure to Dursban and Diazinon, two of the chemicals that PESCO sprayed at the residence. These prospective witnesses had no relevant information regarding the exposure level of the chemicals or the dose that the plaintiffs had allegedly ingested. At least one witness acknowledged that he was making an assumption as to the dose level. Additionally, while the ventilation qualities of the home were of importance, the plaintiffs' experts had never seen the residence and did not have any specific information regarding the size of the house or configuration of any ventilating system.

There was only an equivocal diagnosis that Larry Hannan and Wilhite suffered from Reactive Airways Disease Syndrome (RADS) as a result of PESCO's treatment. Moreover, no medical or scientific literature supported a conclusion that the chemicals to which the plaintiffs were allegedly exposed could cause RADS. None of the experts offered theories regarding alternative reasonable causes of the symptoms that the plaintiffs displayed. The experts also conceded that there are numerous causes for each symptom, but no efforts were made to investigate such possible

causes. The plaintiffs now appeal the decision of the trial court with respect to the exclusion of the expert testimony and the grant of the motion for summary judgment in PESCO's favor.

## DISCUSSION AND DECISION

### I. Standard of Review

In reviewing the trial court's grant of summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *Smith v. Allstate Ins. Co.*, 681 N.E.2d 220, 223 (Ind.Ct.App.1997). We do not weigh evidence but will liberally construe the facts in the light most favorable to the nonmoving party. *General Motors Corp. v. Northrop Corp.*, 685 N.E.2d 127, 132 (Ind.Ct.App.1997), *trans. denied.* Summary judgment should be granted only when the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). On appeal, we must determine whether there is a genuine issue of material fact and whether the law has been correctly applied by the trial court. *City of Elkhart v. Agenda: Open Government, Inc.*, 683 N.E.2d 622, 625 (Ind.Ct.App.1997), *trans. denied.* The party appealing the grant of summary judgment has the burden of persuading this court on appeal that the trial court's ruling was improper. *Jordan v. Deery*, 609 N.E.2d 1104, 1107 (Ind.1993). We also note that where expert testimony is advanced to establish causation, summary judgment is properly entered in favor of the defendant where that testimony fails to meet the admissibility requirements of Evid. R. 702. *Hottinger v. Trugreen Corp.*, 665 N.E.2d 593, 595 (Ind.Ct.App. 1996), *trans. denied.*

### II. The Plaintiffs' Claims

#### A. Admission of Expert Testimony, Generally

To determine whether the trial court erroneously excluded the plaintiffs' pur-

ported expert testimony, we first note the relevant provisions of Evid. R. 702:

> (a) If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
>
> (b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

■ In construing the above, our supreme court has determined that two requirements must be met in order for a witness to qualify as an expert. In *Bacher v. State,* 686 N.E.2d 791, 800 (Ind.1997), the court noted that "(1) the subject matter is distinctly related to some scientific field, business or profession beyond the knowledge of the average lay person; and (2) the witness is shown to have sufficient skill, knowledge or experience in that area so that the opinion will aid the trier of fact." The proponent of expert testimony bears the burden of establishing the foundation and reliability of the scientific principles and tests upon which the experts' testimony is based. *McGrew v. State,* 682 N.E.2d 1289, 1290 (Ind.1997). Evidentiary rulings, including a decision to exclude expert testimony, lie solely within the discretion of the trial court and will not be reversed absent an abuse of that discretion. *Lytle v. Ford Motor Co.,* 696 N.E.2d 465, 470 (Ind.Ct.App.1998), *trans. denied.* Stated another way, we reverse a trial court's decision to exclude evidence only if that decision "is clearly against the logic and effect of the facts and circumstances before the Court, or the reasonable, probable and actual deductions to be drawn therefrom." *Wallace v. Meadow Acres Manufactured Housing, Inc.,* 730 N.E.2d 809, 812 (Ind.Ct.App.2000).

■ We also note that Evid. R. 702 requires that the expert be qualified by "knowledge, skill, experience, training or education." An expert must have sufficient skill in the particular area of expert testimony before the expert can offer opinions in that area. *Harlan Sprague Dawley v. S.E. Lab. Group,* 644 N.E.2d 615, 621 (Ind.Ct.App.1994), *trans. denied.* An expert in one field of expertise cannot offer opinions in other fields absent a requisite showing of competency in that other field. *Hegerfeld v. Hegerfeld,* 555 N.E.2d 853, 855–56 (Ind.Ct.App.1990). Moreover, questions of medical causation of a particular injury are questions of science necessarily dependent on the testimony of physicians and surgeons learned in such matters. *See Brown v. Terre Haute Regional Hosp.,* 537 N.E.2d 54, 61 (Ind.Ct.App.1989).

■ In essence, Evid. R. 702 assigns to the trial court a "gatekeeping function" of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. *Hottinger,* 665 N.E.2d at 596; *see also Wallace,* 730 N.E.2d at 812. When faced with a proffer of expert scientific testimony, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Hottinger,* 665 N.E.2d at 596. Scientific knowledge admissible under Evid. R. 702 connotes more than subjective belief or unsupported speculation. *Id.* Thus, expert testimony must be supported by appropriate validation or "good grounds" based on what is known establishing a standard of evidentiary reliability. *Steward v. State,* 652 N.E.2d 490, 498 (Ind. 1995). Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be empirically tested. *Hottinger,* 665 N.E.2d at 596. Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication. *Id.* Widespread acceptance can be an important factor in ruling

whether particular evidence is admissible under Evid. R. 702 and a technique which has attracted only minimal support may properly be viewed with skepticism. *Id.* While such factors are useful, there is no specific "test" or set of "prongs" which must be considered in order to satisfy Evid. R. 702(b). *Wallace,* 730 N.E.2d at 813.

### B. The Plaintiffs' Purported Experts

▆ Here, the plaintiffs contend that the trial court erroneously excluded the proposed testimony of Michael Evans, Ph. D.; R. Michael Kelly, M.D., M.P.H.; and Alfred Johnson, D.O. Each purported expert offered an opinion that the adverse health effects suffered by the plaintiffs were caused by the chemicals that PESCO had applied.[2] Inasmuch as the plaintiffs assert that these individuals offered their proposed testimony based upon their training, education and experience, they maintain that the exclusion of those opinions constituted an abuse of the trial court's discretion. *See* Appellants' reply brief at 7.

Dr. Alfred Johnson sought to testify that the plaintiffs' exposure to Diazanon and Dursban, the chemicals that were sprayed at the Hannan's residence by PESCO, triggered a condition in the plaintiffs known as Multiple Chemical Sensitivity.[3] Appendix at 3. Dr. Johnson's proposed testimony presumed knowledge in a number of medical specialties including neurology, toxicology, immunology and medical causation.

The record reveals that Dr. Johnson is an osteopathic physician. He is not board certified in internal medicine by the American Osteopathic Association, and has failed to pass the certification test on a number of occasions. Moreover, he has never taken the allergy or immunology board examinations that were offered by the American Osteopathic Society. Supp. R. at 1782–85. Dr. Johnson is not board certified in allergy, immunology, preventive medicine, occupational medicine, public health, epidemiology, neurology, toxicology, immuno-toxicology or psychiatry. Supp. R. at 1788–91.

Dr. Johnson's methodology for diagnosing Mary Jane Hannan and Jennifer Wilhite with Multiple Chemical Sensitivity consisted of a physical examination of Mary Jane followed by an interview. He did not perform any testing on Mary Jane. Supp. R. at 1523–26. Dr. Johnson's protocol for determining whether a chemical has caused a particular illness did not include an analysis of the exposure levels or the dose of the chemical received by the plaintiffs. Supp. R. at 1515–19, 1522. He had no information regarding the exposure level of the chemical in the Hannans' house or the dose allegedly received by any of them. Moreover, while Dr. Johnson acknowledged that the figures relating to quantitative measurements of exposure level or dose could have been reproduced through modeling studies, he admitted that he had not attempted to perform any such calculations. Supp. R. at 1541.

Dr. Johnson had never visited the Hannan's residence, had not examined any photographs and had not been provided with a description of the floor plan of the house. Supp. R. at 1553. He was unfamiliar with the square footage of the house, its dimensions, or the location of any windows which were factors relevant to the ventilation of the residence. Supp. R. at 1554–55. He was also not aware of the concentration and duration of exposure to the chemicals. While Dr. Johnson personally interviewed Mary Jane before render-

---

2. We note that another physician, Doris Rapp, offered testimony with respect to Kaitlyn's condition. However, that testimony is irrelevant, inasmuch as Kaitlyn is not a party to this appeal.

3. Various jurisdictions have rejected the "multiple chemical sensitivity" theory. *See Coffey v. County of Hennepin,* 23 F.Supp.2d 1081, 1085 (D.Minn.1998); *Summers v. Missouri Pacific R.R. Sys.,* 897 F.Supp. 533, 536–37 (E.D.Okla.1995).

ing his opinion, he simply obtained a medical history from her and ordered some laboratory tests to detect whether her body tissues indicated a recent toxic exposure. Supp. R. at 1524–26. The tests revealed normal exposure to all tested toxins. Dr. Johnson admitted that he had only made a "presumptive diagnosis" of chemical sensitivity for Mary Jane based upon her symptoms. Supp. R. at 1511–12.

In addition to the above, Dr. Johnson conceded that the plaintiffs' symptoms, which included shortness of breath, irritability and headaches, could have been caused by other ailments. He did not exclude other possible bases for the ailments, and the symptoms for over exposure to the chemicals that PESCO applied included excess salivation, urination and diarrhea which the plaintiffs did not exhibit.

Dr. Evans sought to testify regarding toxic exposure and medical causation, including opinions that the plaintiffs' acute symptomology was caused by organophosphate exposure. Supp. R. at 1228–30. While Dr. Evans received his doctorate degree in toxicology, he does not have a medical degree, is not board certified in any medical discipline and has never diagnosed or cared for patients. He also admitted that he is not qualified to examine patients or define human medical diagnoses based upon neurological symptoms. Supp. R. at 1560–61, 1564, 1583–84. Dr. Evans conceded that he is not qualified to testify regarding medical causation. Supp. R. at 1583–84, 1597–98, 1599.

Dr. Evans also admitted that he had no information regarding the exposure level of the chemicals or the actual dose received by any of the plaintiffs. Supp. R. at 1581–82. He did not consider the "no observable effect levels" (NOEL) guidelines or other residential and occupational exposure guidelines prior to rendering his opinions with respect to causation. Like Dr. Johnson, Dr. Evans had never inspected the plaintiffs' residence and was unaware of any specific information about its size, the number of windows in the home or whether there were ceiling fans at the residence. Dr. Evans conceded that all of this information was relevant, inasmuch as the exposure level to the chemicals depended on where it was applied in terms of ventilation and air flow. Supp. R. at 1578.

Dr. Evans agreed that if the chemicals had been properly applied, the plaintiffs would not have suffered any medical effects from them. Supp. R. at 1593. Dr. Evans then acknowledged that the application of the chemicals appeared to be "within what the recommended levels were." Supp. R. at 1590–91. He further conceded that without evidence that the chemical was misapplied, there was no cause-and-effect basis to conclude that the plaintiffs were overexposed to the chemical. Supp. R. at 1591–92.

Dr. Kelly contended that Mary Jane and Jennifer Wilhite acquired immunologic abnormalities as a result of the chemicals that PESCO had applied to the residence. Appendix at 5. He reached this conclusion after relying upon blood tests that had been taken five years after the exposure. Moreover, Dr. Kelly admitted that he had not received the test results prior to making his diagnosis of "immunologic abnormalities." Supp. R. at 1670. Additionally, Dr. Kelly only tentatively and equivocally diagnosed Larry Hannan and Wilhite with RADS as a result of their exposure to the pesticides. However, he conceded that the symptoms and alleged exposure do not satisfy the generally accepted and required criteria for diagnosing RADS. Supp. R. at 1733–34, 1747. There is no medical or scientific literature which supports the conclusion that the chemicals can cause RADS at any dose. Supp. R. at 330.

Dr. Kelly's diagnosis of a causal connection between the pesticide application and the symptoms alleged by the plaintiffs was devoid of any analysis of the exposure levels or the dose of the pesticides received by the plaintiffs, despite his admission that such figures are relevant in the

scientific methodology. Dr. Kelly did not make or rely upon any estimates of the exposure levels or dose levels that the plaintiffs received regarding any of the pesticides at issue here. Like the other physicians, he had never been to the residence and had not examined any blueprints of the house. Dr. Kelly also did not know the duration of the plaintiffs' alleged exposure to the chemicals. In short, Dr. Kelly acknowledged that he was simply making an assumption regarding the dose level received by the plaintiffs.

Dr. Kelly had also never published any scientific or medical literature regarding organophosphate chemicals or immunological disorders and could cite to no such peer-reviewed authority supporting his medical causation conclusions. Thus, his theory regarding the alleged injuries was devoid of support in the scientific and medical literature. Supp. R. at 1674, 1678–79, 1682, 1699–1700, 1717–19.

In addition to the above, Dr. Kelly did not offer any theory to explain how he excluded other possible causes of the alleged symptoms, and could not identify any alternative plausible causes for the illnesses. He obtained medical histories from the plaintiffs and reviewed limited post-exposure medical records that were supplied by the plaintiffs' counsel. Dr. Kelly admitted that his diagnoses of the purported illnesses were based primarily on the plaintiffs' self-reported medical histories. Supp. R. at 1769.

Dr. Kelly was unaware that Wilhite had been exposed to various chemicals in 1977, 1985 and 1987, which cause a person to experience headaches, burning eyes and nausea. These were the same subjective symptoms that Wilhite had complained of following the pesticide application. Dr. Kelly also conceded that there are numerous causes for each of the symptoms but made no effort to investigate them. Supp. R. at 1712–13. He acknowledged that pre-existing psychological disorders could have caused the symptoms that Wilhite experi-

enced after the application. Supp. R. at 1720.

Dr. Kelly never conducted a physical examination, full blood work-up, or any pulmonary function tests on Mary Jane. His diagnosis of her was based entirely upon an incomplete set of post-exposure records and a one-hour telephone interview where he obtained a medical history. Supp. R. at 1749–53. Dr. Kelly was not aware that only three months before the pesticide application, Mary Jane had been admitted to the hospital with symptoms of chest pain, numbness, stress and anxiety. Supp. R. at 1753–54. Notwithstanding the plaintiffs' history of medical and psychological problems prior to the application, Dr. Kelly never addressed or even considered the role that the plaintiffs' pre-existing problems may have played in causing their alleged injuries.

■ In sum, it is apparent from the proposed testimony of the experts that they were relying on a mere temporal coincidence of the pesticide application and the Hannans' alleged and self-reported illness. Such a relationship is insufficient to establish a prima facie case on the element of causation. *Turner v. Davis*, 699 N.E.2d 1217, 1220 (Ind.Ct.App.1998), *trans. denied* (development and cause of an ailment such as the plaintiff's was a complicated medical question requiring expert testimony. Thus, plaintiff's allegation that she developed a sleep disorder after an automobile accident but did not present any expert testimony in support of her claims should not have been submitted to the jury). None of the purported experts performed any testing that would rule out alternative causes of the plaintiffs' ailments. Such "differential diagnosis" testing is important in toxic tort cases so that other causes may be negated. *See Tucker v. Nike*, 919 F.Supp. 1192 (N.D.Ind.1995); *see also Indiana Michigan Power Co. v. Runge*, 717 N.E.2d 216 (Ind.Ct.App.1999). Thus, the opinions of the plaintiffs' experts were tantamount to subjective belief or unsupported speculation.

Despite the plaintiffs' history of medical and psychological conditions that existed prior to the chemical application by PESCO, the purported experts never addressed or even considered the role that such pre-existing complications may have contributed in causing their alleged injuries. The plaintiffs have alleged multiple subjective symptoms such as headaches and nausea, which are associated with numerous common illnesses. The plaintiffs' witnesses also conceded that such symptoms could be caused by other chemicals and ailments. The record also indicates that the trial court properly excluded the testimony of the purported experts because they were not qualified to testify as to medical causation and their methods and opinions: (1) were unreliable; (2) were not grounded in scientific knowledge; (3) were not generally accepted in the relevant scientific community, and (4) failed to negate other possible causes of the plaintiffs' illnesses and were based on a mere, alleged temporal relationship. *See Wallace,* 730 N.E.2d at 815 (expert's testimony as to what chemical level in mobile home would have been was insufficiently reliable to be admitted in plaintiff's action resulting from formaldehyde exposure because predictions were based on a single measurement, the equation used was not generally accepted in the scientific community, the theory could not be empirically tested and the theory and methodology lacked substantial peer review and exhibited a large, unquantifiable rate of error).

Notwithstanding the above, the plaintiffs rely upon this court's holding in *Femco v. Colman,* 651 N.E.2d 790 (Ind.Ct.App. 1995), in an effort to overcome the failure of their proposed experts to offer admissible evidence. In that case, we held that under the circumstances, the trial court did not abuse its discretion in refusing to strike the affidavit of a treating physician which, along with the material data sheet and one defendant's responses to certain interrogatories, created a triable issue of fact sufficient to deny summary judgment. *Id.* at 794.

In *Femco,* it was established that the plaintiff had been exposed to the substance at issue. *Id.* at 791. Unlike the circumstances in *Femco,* there is no credible evidence of exposure to any level of the pesticide and the plaintiffs' experts could not explain how the exposure may have occurred. While it may have been appropriate for the treating physician in *Femco* to assume, without personal knowledge, that the plaintiff had suffered exposure to the chemical, there is no such basis for any treating physician to make such an assumption here. Moreover, unlike the circumstances in *Femco,* the PESCO's experts acknowledged that the pesticides could not have caused the plaintiffs' injuries. R. at 5058; Supp. R. at 339; 775, 786, 797, 1006-07. Thus, we reject the plaintiffs' reliance upon *Femco.* As a result, the trial court acted within its discretion and properly excluded the testimony of Drs. Johnson, Evans and Kelly.

### III. Claim of Negligence Per Se

The plaintiffs next contend that the trial court erred in failing to find that PESCO was negligent *per se.* In support of their claim, they maintain that the undisputed evidence demonstrated that Gaylord, the PESCO employee who treated the residence, failed to comply with the instructions set forth on the registered pesticide label and used a faulty or unsafe sprayer.

 To resolve this issue, we first note that the label on the pesticide container only provides that a "desirable" level of the chemical should be used. The plaintiffs offer no authority that exceeding a "desirable" level rises to the level of a violation of federal law. Moreover, they have not demonstrated that the label means "desirable" in terms of safety, rather than in terms of effectiveness for pest eradication.

 Next, we note that the plaintiffs rely upon IND. CODE § 15-3-3.6-14 in support of its argument which provides in relevant part as follows:

The state chemist may also deny, suspend, revoke, or modify any provision of any license, permit, or certification issued under this chapter if the state chemist finds that the applicant or the holder of a license or permit has committed any of the following acts, each of which is a violation of this chapter:

. . . .

(2) Recommended, used, or supervised the use of any registered pesticide in a manner inconsistent with its labeling approved by the United States Environmental Protection Agency or Indiana state registration for that pesticide, or in violation of the United States Environmental Protection Agency or Indiana state restrictions on the use of that pesticide.

(3) Operated faulty or unsafe equipment.

(4) Operated in a careless or negligent manner.

Here, the plaintiffs' argument is premised on Gaylord's testimony that the sprayer did not have increments marked to determine the amount of product applied, that the tank was fifteen years old, and that the exterior of the sprayer was "worn and scratched." R. at 3. The plaintiffs offer no basis for finding that any of these conditions rendered the sprayer faulty or unsafe which would result in a violation of I.C. § 15–3–3.6–14. None of the plaintiffs' experts purported to have any expertise in pesticide application or as to what would constitute "faulty or unsafe" equipment. Moreover, neither Gaylord nor anyone else offered any testimony establishing that the sprayer was faulty or unsafe. Thus, the plaintiffs may not prevail upon this argument.

### IV. Spoliation of Evidence

The plaintiffs next assert that the act of cleaning the Hannan's residence after the spraying resulted in the spoliation of evidence. Specifically, they contend that this alleged spoliation created "an inference that there was a sufficient dose of organo-phosphates to cause the acute and chronic adverse health effects suffered by [the plaintiffs]." Appellant's brief at 15.

We first note that while the plaintiffs raise this argument in the summary portion of their appellate brief, they omit it from their argument section and fail to provide any citation to authority in support of their contention. As a result, the issue is waived. See Ind. Appellate Rule 8.3(A)(7); see also Choung v. Iemma, 708 N.E.2d 7, 13 (Ind.Ct.App.1999).

Waiver notwithstanding, the plaintiffs make no showing that PESCO did anything to suppress the evidence as a result of ServiceMaster's efforts in cleaning the house. Even more compelling, the plaintiffs make the bare assumption that the type of cleaning performed by Service-Master would have affected the level of any chemicals that were present in the residence. The plaintiffs have offered nothing to support that assertion and have maintained that their flu-like symptoms persisted even after ServiceMaster had cleaned the residence. R. at 5113, 5118, 5122. Thus, if the cleaning had eradicated the presence of the chemicals, the plaintiffs would not have become ill upon re-entering the house. If, on the other hand, the efforts by ServiceMaster had not affected the level of the chemicals, there would be no spoliation and the plaintiffs should have been able to produce evidence of the presence of chemicals in the house. In either event, the plaintiffs' argument with respect to their spoliation of evidence claim must fail.

### V. Emotional Distress and Property Damage

Finally, the plaintiffs argue that they are entitled to pursue their claim against PESCO for emotional distress and property damages. Specifically, they assert that these claims are independent from the negligence issues which relate to medical causation. See Appellant's brief at 36, 38.

To resolve this issue, we note that a panel of this court in *Adams v. Clean Air Sys., Inc.*, 586 N.E.2d 940 (Ind.Ct.App. 1992), determined that the plaintiff in that case was not entitled to recover damages for emotional distress which allegedly resulted from possible, but not proven, inhalation of asbestos. Specifically, we observed that "some certainty that the plaintiffs actually inhaled the potentially harmful toxin is required prior to the maintenance of the cause of action." *Id.* at 942.

As discussed above, there is a lack of any such certainty that the plaintiffs were exposed to an amount of the chemicals sufficient to cause any effect on them now or in the future. In an effort to circumvent the trial court's ruling with respect to summary judgment, the plaintiffs point to Dr. David Cugell's affidavit which stated that all three members of the Hannan family were exposed to some pesticide in June 1993.

Dr. Cugell, however, is not an expert in toxicology or in any other field that would provide a basis for him to give an expert opinion as to whether the plaintiffs were exposed to the chemical. Moreover, the portion of Dr. Cugell's purported testimony relating to this issue was a summary of the history provided to him by the plaintiffs indicating that they were exposed to the pesticide. In short, nothing in Dr. Cugell's background, evaluation or conclusions would have supported an evidentiary assertion by him that the plaintiffs had been exposed to any pesticide, much less what the possible level of that exposure might have been.

Notwithstanding the above, the plaintiffs cite *Gray v. Westinghouse*, 624 N.E.2d 49, 54 (Ind.Ct.App.1993), *trans. denied*, in support of their claim for damages to their property. Although the circumstances in *Gray* involved a cause of action for nuisance, this court determined that it must be shown that "it is reasonable to believe that the situation would naturally produce physical discomfort to persons of ordinary sensibilities, tastes and habits." *Id.* at 54. Inasmuch as we have concluded that there was a total lack of evidence that the plaintiffs' residence was over-contaminated as a result of PESCO's actions, they cannot establish that any such belief would be reasonable. The failure of the plaintiffs to prove the necessary causation element is that which bars all of the plaintiffs' claims and all damages flowing from those claims, whether those damages are for personal injury, property damage or emotional distress. Thus, there was no error.

## CONCLUSION

In light of our disposition of the issues set forth above, we conclude that the trial court properly excluded the testimony of the plaintiffs' purported expert witnesses. Additionally, the trial court properly rejected the plaintiffs' argument that PESCO was negligent *per se* and correctly determined that PESCO's actions did not result in spoliation of the evidence. Finally, we conclude that the trial court properly dismissed the plaintiffs' claims with respect to their request for damages for emotional distress and property damage for the reason that the plaintiffs have failed to prove the necessary causation element.

Judgment affirmed.

RILEY, J., and KIRSCH, J., concur.