**FOR PUBLICATION**



ATTORNEYS FOR APPELLANT:

**JOHN C. TRIMBLE**
**A. RICHARD M. BLAIKLOCK**
**CHARLES R. WHYBREW**
**JASON M. LEE**
Lewis Wagner, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE,
ArcelorMittal Indiana Harbor LLC:

**JAMES B. GLENNON**
Foran Glennon Palandech Ponzi
& Rudloff, P.C.
Chicago, Illinois

**JOHN E. HUGHES**
Hoeppner Wagner & Evans LLP
Merrillville, Indiana

**KARL L. MULVANEY**
**NANA QUAY-SMITH**
**JESSICA WHELAN**
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| WESCO DISTRIBUTION, INC., | ) |
| | ) |
| Appellant- Defendant, | ) |
| | ) |
| vs. | )　　No.　45A03-1307-PL-274 |
| | ) |
| ARCELORMITTAL INDIANA | ) |
| HARBOR LLC, and ESPU, INC., | ) |
| | ) |
| Appellees-Plaintiffs. | ) |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable John R. Pera, Special Judge
Cause No. 45D10-0802-PL-25

**November 10, 2014**

**ROBB, Judge**

Case Summary and Issues

On April 28, 2006, a ladle containing molten iron unexpectedly descended from its hoisted position and tipped, causing molten iron to spill and ignite a fire which extensively damaged the steel shop at a mill operated by ArcelorMittal Indiana Harbor LLC ("ArcelorMittal") in East Chicago, Indiana. ArcelorMittal determined that the incident was caused when the braking system on the crane hoisting the ladle failed. Specifically, ArcelorMittal determined that parts supplied by WESCO Distribution, Inc. ("WESCO") had fractured and led to the braking system failure. ArcelorMittal sued WESCO for breach of implied warranties and breach of contract. After extensive pre-trial proceedings and a twenty-two day trial, a jury found in favor of ArcelorMittal and awarded damages in the amount of $36,134,477. The trial court subsequently awarded ArcelorMittal prejudgment interest in excess of three million dollars on the amount it expended to repair its facility and entered final judgment for ArcelorMittal and against WESCO in the amount of $39,031,555.96.

WESCO appeals the judgment, alleging several instances of reversible error:

     1. The trial court erroneously denied WESCO's motion for summary judgment and motion for judgment on the evidence regarding ArcelorMittal's expert testimony on causation, which WESCO vigorously contested as inadmissible and without which it claims there is no evidence that its alleged breach was the cause of the spill;

2. The trial court erroneously failed to sanction ArcelorMittal for destruction of certain evidence WESCO claims was critical to its defense;

3. The trial court erroneously admitted ArcelorMittal's expert testimony on product identification, without which it claims there is no evidence that both contactors on the crane were supplied by WESCO;

4. The trial court erroneously denied WESCO's motion for summary judgment and motion for directed verdict because as a matter of law the "freak convergence of events" leading to the incident was not foreseeable and the fractured parts were not the proximate cause of the event;

5. The trial court erroneously prevented WESCO from admitting evidence of subsequent remedial measures taken by ArcelorMittal.

WESCO also contends the trial court abused its discretion in:

6. Ruling on a dispute regarding the discoverability of certain insurance investigation materials;

7. Awarding prejudgment interest; and

8. Instructing the jury regarding the measure of damages.

We conclude WESCO has not shown that the trial court committed any reversible errors or that the trial court abused its discretion in its handling of the discovery issue. We also conclude, however, that the trial court did abuse its discretion in awarding prejudgment interest to ArcelorMittal. Accordingly, we reverse the award of prejudgment interest and remand for re-entry of the final judgment in an appropriate amount. In all other respects, the trial court is affirmed.

Facts and Procedural History[1]

ArcelorMittal operates a steel shop at its mill in East Chicago where molten iron is transported in ladles from one end of the shop via an overhead crane to charge a basic

---

[1] We heard oral argument in this case on August 26, 2014, in Indianapolis, Indiana. We commend counsel on the quality of their presentations, especially in light of the lengthy and complicated factual and procedural history of this case. We also extend our appreciation to the Appellant for submitting a CD containing electronic copies of its brief, addendum to its brief, the transcript, and the twenty-two volume appendix, which greatly assisted our consideration of this case.

3

oxygen furnace located at the other end of the shop. The crane rides on rails located near the ceiling and travels over a crosswalk. The crane lifts a ladle and keeps it raised in a standby position until the crane operator receives orders to charge the furnace with the contents of the ladle. The hoist motors that raise or lower the ladle are controlled by a main hoist controller in the cab of the crane. It is described as a joystick-type mechanism such that moving the controller one way causes the ladle to hoist and moving it the other way causes the ladle to lower. Placing the controller in the center or neutral position causes the crane's brakes to engage and hold the ladle in place. The crane has both dynamic and mechanical brakes. When the controller is placed in neutral, dynamic braking contactors ("contactors") in the dynamic brake system slow the rotation of the hoist motors by dissipating electrical currents through the contactors' blowout coils.[2] The mechanical brakes then engage to bring the load to a stop and hold it in place. An auxiliary hook moves independently of but in concert with the ladle. When the ladle reaches the furnace, the auxiliary hook is maneuvered into place to catch a "dump lug" on the ladle and tip the ladle so its contents empty into the furnace.

On April 28, 2006, Frank Verta was operating what is known as the east charging crane and had raised a full ladle into a stationary position when it suddenly began descending. Verta was unable to control the ladle's descent with the controller. As the ladle descended, it caught on the auxiliary hook that Verta had previously positioned below the ladle and tipped, spilling the molten iron onto the floor of the shop and igniting a fire that engulfed the command tower in the shop. Due to the extensive damage, the

---

[2] The crane at issue has two Size 8 contactors, referred to as the north and south contactors.

4

facility was inoperable for approximately two weeks and then only partially operable for approximately two more weeks.

Within hours of the incident, Gerald Rutledge, area supervisor for the shop, and two other ArcelorMittal employees inspected the crane and saw nothing wrong with the mechanical brakes. They asked Verta to operate the crane as they inspected the dynamic brakes, and saw a "flash" from the north contactor. Transcript at 3019. Upon looking closer, they realized the blowout coil in that contactor was separated. They removed the blowout coil, which came out in two pieces, and replaced it. They then asked Verta to run the crane again and although the north contactor was working properly, Verta said the crane was still not acting right. They turned their attention to the south contactor and discovered that its blowout coil was also bad, so they replaced it as well. They then ran the crane several times, and it worked normally. They finished this inspection by approximately noon on April 29, and Rutledge told Bruce Black, the shop manager, that the contactors were "burned up" and they had found nothing else wrong with the crane. Tr. at 3050.

Rick Marwitz, who worked for the business administration department of central maintenance for ArcelorMittal, was part of an in-house team that investigated the incident for the plant beginning on Monday, May 1, 2006. As part of the investigation, they looked at the main hoist controller and felt the side-to-side movement was "kind of sloppy," tr. at 3092, and Marwitz told Rutledge within four or five days of the incident that the controller needed some work, tr. at 3093. He did not specifically tell Rutledge to keep any parts that were replaced, though he did ask later to see them. While Rutledge

5

was fixing the issue Marwitz referenced, he just "[t]ook all the guts out," tr. at 3094, and replaced everything in the controller. Rutledge had looked at the controller before it was removed from the crane and again when it was in the shop to be rebuilt and saw nothing out of the ordinary, but as far as he was concerned, they had already found the problem so he was not looking closely. Rutledge said that Henry Pospychala, an ArcelorMittal employee who helped rebuild the controller, thought all the parts from the controller "looked so good . . ., he wanted to save them" because "he had a problem with throwing stuff away . . . ." Tr. at 3158-59. But Rutledge threw away the cams, bearings, and contacts because "if you don't get rid of parts you change, that whole shop would be overflowed [sic] with parts . . . ." Tr. at 3156. Neither Rutledge nor Pospychala testified that they were told to save the parts. As part of his investigation, Marwitz tracked all of the Size 8 contactors in the plant, both those currently on cranes and spares not in use. He also reviewed the purchasing information for those contactors. The in-plant investigation did not reach a conclusive determination about the cause of the incident, but Marwitz testified they did know "the blowout coils contributed to the crane not being able to stop for two reasons. One, that's their purpose to slow the load. Two, after they were changed, the crane functioned normally." Tr. at 3789-90.

On May 4, 2006, the investigation was turned over to Engineering Design and Testing ("EDT"), which had been retained by ArcelorMittal's insurer. As part of EDT's investigation, it took measurements, conducted interviews, and simulated the incident on-site in December 2006; and then fully reconstructed the incident at the plant in August 2007. When EDT bypassed first one and then both of the contactors and the blowout

6

coils to disable the dynamic braking system during the reconstruction, the mechanical brakes alone stopped the ladle from descending. EDT therefore determined the fractured blowout coils could not have been the sole cause of the incident. Ultimately, EDT determined that the cause of the ladle's uncontrolled descent was a fracture of the blowout coils in each of the crane's two dynamic braking contactors coupled with an unexpected electrical configuration within the main hoist controller. ArcelorMittal further determined that it had purchased the contactors and the blowout coils within from WESCO, a distributor of industrial supplies. ArcelorMittal had ordered four contactors from WESCO in 2004; specifically, four "Hubbell DB Contactor NEMA Size 8." Appellant's Appendix at 1412-13; see also id. at 1421-22. Hubbell Industrial Controls, Inc. is a manufacturer of industrial parts. WESCO, however, obtained the contactors from EPSU, Inc., a company that both manufactured and supplied industrial parts. Some of the parts EPSU supplied were manufactured by EPSU, others were obtained from other manufacturers. Some of the parts EPSU manufactured were reverse-engineered from other manufacturers' products. In this case, EPSU provided to WESCO which in turn provided to ArcelorMittal "Hubbell-style" contactors which EPSU manufactured and which contained an outdated blowout coil design[3] instead of providing original, current Hubbell contactors with Hubbell components. ArcelorMittal determined there were four contactors purchased from WESCO in the plant at the time of the incident, two in spares and two on the east charging crane.

_____

[3] Although the parties frequently reference a pre-2004 Hubbell design change to add a screw at a weld in the blowout coil which the contactors supplied by WESCO did not have, this is primarily relevant to the products liability claim which was not submitted to the jury.

ArcelorMittal initiated this litigation in 2007. Among the extensive and lengthy pre-trial proceedings and the multiple motions and objections filed and argued at trial, the following are relevant to the issues on appeal:

During discovery, WESCO requested ArcelorMittal produce certain insurance investigator/adjuster documents. ArcelorMittal produced the claim file relating to the loss, but redacted some of the documents produced and withheld other documents altogether on the basis of work product and/or attorney-client privilege. On October 22, 2008, WESCO filed a motion to compel the production of the insurance documents in full. After briefing, argument, and multiple *in camera* reviews of the disputed documents, the trial court, with limited exception, approved the redaction and withholding of the documents.

As related in the facts above, ArcelorMittal disposed of and/or altered certain parts and equipment in the immediate aftermath of the incident. Specifically, WESCO notes the internal components of the main hoist controller were discarded; the blowout coils were found to be fractured only after the crane was operated after the incident; the contactors continued in service after the fractured blowout coils were replaced; one contactor was ultimately lost; and the crane's braking systems were not preserved in the condition they existed at the time of the incident. In addition, the parts and equipment were not documented in the state they existed at the time of the incident. On June 12, 2012, WESCO filed a motion for sanctions due to spoliation of evidence, seeking dismissal of the case because WESCO's defense had been prejudiced by ArcelorMittal's actions. The trial court deferred ruling on the motion until trial, at the conclusion of

8

which it denied the motion and declined to impose any sanctions on ArcelorMittal. WESCO then requested that the jury be instructed that since ArcelorMittal failed to produce that evidence, it may conclude the evidence was unfavorable to ArcelorMittal. The trial court also declined to give the instruction.

ArcelorMittal intended to offer the testimony of Dr. Timothy Jur and Glenn Robinson, both of EDT, to show that a fracture of the blowout coils in both contactors was the cause of the brake failure. On September 18, 2012, WESCO filed a motion for summary judgment alleging, *inter alia*, that ArcelorMittal's expert opinions on causation were based upon assumptions that were not supported by the record and therefore did not create a genuine issue of fact regarding whether the blowout coils were the proximate cause of the accident. The trial court apparently made no ruling on the summary judgment motion. On December 14, 2012, WESCO filed a motion to exclude ArcelorMittal's expert testimony alleging it was unreliable and therefore inadmissible pursuant to Indiana Rule of Evidence 702. Following a hearing, the trial court denied the motion to exclude. WESCO again argued ArcelorMittal's expert testimony was unreliable in making a motion for judgment on the evidence at the conclusion of ArcelorMittal's case in chief and in making a motion for directed verdict, both of which the trial court denied.

WESCO's motion for summary judgment, motion for judgment on the evidence, and motion for directed verdict also included allegations that the convergence of events leading to the ladle spill and ensuing fire were not foreseeable as a matter of law.

9

WESCO did not prevail on any of those motions. WESCO then raised the foreseeability issue in its motion to correct errors, which was also denied.

In a motion in limine filed December 14, 2012, ArcelorMittal requested an order prohibiting WESCO from "discussing, arguing, attempting to offer into evidence, commenting or in any matter [sic] conveying in the presence of the jury" post-incident remedial measures taken by ArcelorMittal, among other things. App. at 4016, 4025-27. WESCO opposed this motion on several grounds, including that Evidence Rule 407 inures to the benefit of defendants; that even if it could be used by plaintiffs, the evidence ArcelorMittal sought to exclude is admissible under that rule; and further, it is admissible for another purpose under the rule. The trial court determined Rule 407 is "party neutral" and ruled that evidence of subsequent remedial measures was not admissible. During trial, WESCO argued ArcelorMittal had opened the door to evidence of a policy change by ArcelorMittal after the incident regarding where crane operators were to keep the auxiliary hook relevant to the ladle. It also argued evidence regarding the installation of safety features on the controller after the incident should be allowed. The trial court declined to allow the evidence.

During trial, ArcelorMittal offered the testimony of its expert Dr. Jur regarding the source of the blowout coils. WESCO objected because "this is not an area of expert testimony. It's also cumulative of testimony that's already been offered in this case. Pursuant to 7-0-2, it is clearly not within the scope of expert testimony." Tr. at 4239. The trial court ultimately allowed Dr. Jur's testimony, finding that his review of the purchasing and tracking documentation gave him specialized knowledge about the source

10

of the blowout coils. WESCO raised this issue again in its motion for judgment on the evidence and in its motion for directed verdict. The trial court denied both motions.

A jury trial was held from January 14, 2013 to February 14, 2013. The claims submitted to the jury were ArcelorMittal's claims against WESCO for breach of implied warranties and breach of contract.[4] The parties argued at the instruction conference about which instruction with regard to the measure of damages for personal property's should be given to the jury. ArcelorMittal advocated an instruction identifying the measure of damages for damaged personal property as the cost of repair, whereas WESCO advocated an instruction identifying the measure of damages for destroyed personal property being its fair market value. Ultimately, the trial court instructed the jury on both standards. WESCO also tendered a "responsible cause" instruction that was given to the jury as a final instruction:

> Sometimes an unrelated event breaks the connection between a defendant's breach of contract or warranty and the injury a plaintiff claims to have suffered. If this event was not reasonably foreseeable, it is an "intervening cause."
> When an intervening cause breaks the connection between a defendant's breach of contract or warranty and a plaintiff's injury, a defendant's breach of contract or warranty is no longer a "responsible cause" of that plaintiff's injury.

App. at 4880.

ArcelorMittal requested damages in the amount of $46,301,777. The jury returned a verdict for ArcelorMittal and against WESCO, awarding damages in the sum of $36,134,477. Following the jury's verdict in its favor and the trial court's entry of

---

[4] ArcelorMittal also asserted claims against Hubbell and ESPU. These claims were not part of the trial and are not at issue here.

11

judgment, ArcelorMittal filed a motion seeking prejudgment interest, claiming it was entitled thereto because the contracts between the parties made ArcelorMittal's claims ascertainable. The trial court granted ArcelorMittal's motion in part:

> [ArcelorMittal] is awarded prejudgment interest at the rate of six percent (6%) per annum from November 21, 2007, the date of filing of [ArcelorMittal's] Complaint, to February 14, 2013, the date of the jury's verdict, on $12,410,777, the amount [ArcelorMittal] claimed to have expended to repair its facility following the event described in the Complaint. The remainder of [ArcelorMittal's] Motion for Prejudgment Interest as well as its request for attorneys' fees is DENIED.

App. at 93. The trial court entered a final judgment dated July 6, 2013:

> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Plaintiff ArcelorMittal be and herby is awarded Final Judgment in the total amount of $38,031,555.96, comprised of (1) the $36,134,477 jury verdict reduced by $1,000,000 as a result of the Acknowledgement of Partial Satisfaction of Judgment filed on April 11, 2013 which partially satisfied the judgment and reduced the amount of judgment remaining unsatisfied to $35,134,477, (2) prejudgment interest in the amount of $3,896,643.96, and (3) costs in the amount of $435.00. . . .

App. at 94.

WESCO now appeals the judgment.

Discussion and Decision

I. Causation Evidence

The elements of a breach of contract claim are the existence of a contract, the defendant's breach, and damages to the plaintiff. Fowler v. Campbell, 612 N.E.2d 596, 600 (Ind. Ct. App. 1993). In addition, the alleged breach by the defendant must be a cause in fact of the plaintiff's loss. Id. at 601. Where an injury arising from the breach may have resulted from multiple causes, the test of causation is not whether the breach

12

was the only cause, or whether other causes may have contributed, but whether the breach was a substantial factor in bringing about the harm. Id. at 602. Where causation is not within a lay person's understanding, expert testimony is necessary. Muncie Indiana Transit Auth. v. Smith, 743 N.E.2d 1214, 1217 (Ind. Ct. App. 2001).

A.  Admission of Expert Testimony, Generally

The admissibility of expert testimony is guided by Indiana Evidence Rule 702 which provides:[5]

> (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
> (b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

A witness must be qualified as an expert by his knowledge, skill, experience, training, or education and must have sufficient skill in a particular area before he may offer opinions in that area. Armstrong v. Cerestar USA, Inc., 775 N.E.2d 360, 366 (Ind. Ct. App. 2002), trans. denied. The proponent of the expert testimony has the burden of establishing the foundation and reliability of the scientific principles on which the testimony is based. Hannan v. Pest Control Servs., Inc., 734 N.E.2d 674, 679 (Ind. Ct. App. 2000), trans. denied. The trial court acts as a gatekeeper by preliminarily assessing whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts in issue and by ensuring the testimony both rests on a reliable foundation and is relevant. Armstrong, 775 N.E.2d at 366. In other words, the

---

[5] The evidence rules cited herein are the versions of the rules in effect when the trial was held in 2013.

trial court is to control the admission of proffered expert testimony rather than admitting what is offered and leaving it to the jury to determine the weight of the testimony. Norfolk S. Ry. Co. v. Estate of Wagers, 833 N.E.2d 93, 101 (Ind. Ct. App. 2005), trans. denied.

Expert testimony admitted under Rule 702 requires more than subjective belief or unsupported speculation. Armstrong, 775 N.E.2d at 366. It "must be supported by appropriate validation or 'good grounds' based on what is known . . . ." Lytle v. Ford Motor Co., 814 N.E.2d 301, 309 (Ind. Ct. App. 2004), trans. denied. WESCO argued in its pre-trial motion for summary judgment, at trial when the expert testimony was offered, and in a motion for judgment on the evidence that ArcelorMittal's expert testimony regarding causation was inadmissible and therefore there was no evidence supporting the blowout coils as a cause of the brake failure.

## B. Summary Judgment

WESCO contends ArcelorMittal did not designate in its response to summary judgment sufficient admissible evidence to raise a genuine issue of material fact as to causation and therefore, the trial court should have granted summary judgment in favor of WESCO. Preliminarily, ArcelorMittal contends that the only ruling subject to appellate review is the admission of the expert testimony at trial over objection because the trial court never ruled on the motion for summary judgment and WESCO did not object to the failure to rule before going to trial. See Brief of Appellee at 37 n.10. Although it is unclear why the motion was never ruled on, it is clear that the motion was denied, even if only by implication, and the denial of a motion for summary judgment is reviewable on

appeal even following a trial on the merits. <u>Keith v. Mendus</u>, 661 N.E.2d 26, 35 (Ind. Ct. App. 1996), <u>trans. denied</u>.

When reviewing the denial of a summary judgment motion, we apply the same standard as the trial court: summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C); <u>West v. City of Princeton</u>, 901 N.E.2d 1141, 1143 (Ind. Ct. App. 2009), <u>trans. denied</u>. We construe all facts and reasonable inferences drawn from those facts in favor of the nonmoving party. <u>West</u>, 901 N.E.2d at 1143. To prevail on a motion for summary judgment, the moving party must demonstrate that the undisputed material facts negate at least one element of the other party's claim. <u>Id.</u> Once the moving party has met this burden with a prima facie showing, the burden shifts to the nonmoving party to establish that a genuine issue of material fact does in fact exist. <u>Id.</u> WESCO, as the party appealing the denial of summary judgment, bears the burden of persuading us that the trial court erred. <u>Id.</u>

EDT's report about the cause of the incident, designated by WESCO in support of its motion for summary judgment, states:

> It has been determined from the reconstruction of the incident that the ladle with a full load of molten pig iron and being hoisted by the east charging crane descended out of control as a result of the brakes on the crane not having engaged as intended by the hoist control system when the hoist controller was placed into the neutral position by the crane operator. For the brakes to not have been engaged, <u>there had to have been a condition in the hoist control system that came into play</u> as the crane operator was bridging west and <u>as the operator was adjusting the hoisted position of the ladle by moving the hoist control to a lowering position and then back to neutral.</u>

15

The condition in the control system consisted of three contributors: a fractured blowout coil in a Hubbell-type Size 8 dynamic braking contactor in the west hoist motor circuit, a fractured blowout coil in a Hubbell-type Size 8 dynamic braking contactor in the east hoist motor circuit, and a loose switch in the hoist controller in the operator's cab of the crane.

App. at 2773 (emphasis added). Designated portions of the deposition testimony of Dr. Jur and Robinson, both of whom contributed to the report, are consistent with and provide details regarding their conclusions. WESCO's motion for summary judgment alleged that this theory of causation is based upon the assumptions that Verta was lowering the hoist immediately prior to the incident—which it claims is contradicted by the designated evidence—and that there were loose screws in the controller—which it claims is unsupported by the designated evidence.

WESCO asserts the opinions are inadmissible under Rule 702 to prove causation, there was no other evidence of causation, and it was entitled to judgment as a matter of law. Rule 702 "was designed to control the use of expert opinion testimony <u>at trial</u>." <u>Doe v. Shults-Lewis Child and Family Servs., Inc.</u>, 718 N.E.2d 738, 750 (Ind. 1999) (emphasis added). Nonetheless, where expert testimony is advanced to establish causation, summary judgment is proper in favor of the defendant where the testimony fails to meet the requirements of Rule 702. <u>Lytle</u>, 814 N.E.2d at 308. There must be some evidence other than the opinion itself that supports the theory. <u>See</u> <u>Estate of Dyer v. Doyle</u>, 870 N.E.2d 573, 580-81 (Ind. Ct. App. 2007) (defendant's expert's testimony about the "faked left syndrome" was unsupported by the physical evidence or testimony and trial court abused its discretion in admitting it), <u>trans. denied</u>.

As for Verta's actions, it appears undisputed at the summary judgment stage that Verta never specifically said he lowered the hoist control before returning it to neutral immediately before the ladle began its descent. His deposition testimony was:

> I was—I was set up by the east of the walkway, waited for the furnace operator to charge No.2 furnace, and my control was centered. It was in neutral. And all—he say [sic] okay, we're going to charge the furnace. And as soon as I start to move, bridge west, I see that my ladle started going down by itself, and my control, it was on neutral. I grabbed the controls, my main hoist controls, I want all the way open to go up. I figure the ladle is going to go up.

App. at 2913. When he picked up the controls, "[i]t was center . . . . I look at it. It was right in front of me." Id. Other ArcelorMittal crane operators testified in depositions that they would lower the hoist after getting the order to charge the furnace in order for the ladle to be in alignment with the furnace.[6] See, e.g., App. at 3054-55 (testimony of Marion Daugherty that he would wait with the ladle hoisted until getting the command to charge the furnace, then "I would go over the walkway, then when I got on the other side of the walkway, I would lower the main hoist . . . down to the position where I can pour it into the furnace. . . . [I]f you didn't lower it down and you went to pour in the furnace, you'd be too high."); App. at 3057 (testimony of Kevin McCabe that upon passing the crosswalk, the elevation of the ladle had to be adjusted).

As for the loose screws, Rutledge testified at his deposition that although he visually inspected the controller when he gutted the components and replaced them all, he could not say for certain that all the switches were free and did not stick. App. at 3122.

---

[6] Simplistically, the ladle is picked up at one end of the plant, carried the length of the plant which is bisected by a crosswalk over which the ladle must be lifted, and then maneuvered into position to pour into the furnace at the other end of the plant.

17

Pospychala averred in an affidavit designated on summary judgment that in the four years he worked at the plant prior to the incident, "[s]crews on many components of the east charging crane and other equipment . . . loosen over time. In the course of performing preventative maintenance . . . inside the east charging crane main hoist controller . . . on occasion I have found some of those screws to be loose, anywhere up to a couple of turns." App. at 3136.

The support at the summary judgment stage for the expert opinion was based more upon negative inferences—i.e., Verta said <u>when the ladle began its descent</u> the controller was in neutral, but he did not specifically deny lowering the hoist <u>just before the ladle began to descend</u>; Rutledge did not see any loose screws in the controller but could not say that there were not any—than positive, direct evidence. However, other crane operators testified to the need to adjust the elevation of the ladle in the situation Verta was in and Pospychala averred he had found loose screws in controllers on other occasions. Construing all reasonable inferences in favor of ArcelorMittal as the non-movant, the expert opinion is based upon assumed facts that are supported by the designated evidence and at least raises a genuine issue of material fact as to whether the blowout coils were a substantial factor in causing the incident. WESCO has not met its burden of persuading us that the trial court erred in failing to grant summary judgment for WESCO.

### C. Trial

WESCO also claims the trial court erred in denying its motion for judgment on the evidence regarding this issue based upon the expert testimony adduced at trial.

We review a ruling on a motion for judgment on the evidence using the same standard governing the trial court in making its decision: judgment on the evidence is proper only where all or some of the issues are not supported by sufficient evidence. Weinberger v. Gill, 983 N.E.2d 1158, 1162 (Ind. Ct. App. 2013). The court looks only to the evidence and the reasonable inferences drawn most favorable to the nonmoving party, and the motion should be granted only where there is no substantial evidence supporting an essential issue in the case. Id.

Essentially, WESCO argues there was not sufficient evidence on the issue of causation because the expert testimony was inadmissible to prove causation. To this end, WESCO objected to ArcelorMittal's expert testimony at trial. All evidentiary rulings, including those regarding the admissibility of expert testimony, lie within the trial court's discretion. Armstrong, 775 N.E.2d at 365. We reverse only if the trial court abused that discretion by making a decision clearly against the facts and circumstances before it or the reasonable, probable, and actual inferences and deductions drawn therefrom. Hannan, 734 N.E.2d at 679. Additionally, a trial court's decision to admit or exclude evidence will not be reversed unless prejudicial error is clearly shown. Franciose v. Jones, 907 N.E.2d 139, 144 (Ind. Ct. App. 2009), trans. denied. Once the trial court is satisfied that an expert's testimony will assist the trier of fact and that the general methodology is reliable, "then the accuracy, consistency, and credibility of the expert's opinions may properly be left to vigorous cross-examination, presentation of contrary evidence, argument of counsel, and resolution by the trier of fact." Sears Roebuck & Co. v. Manuilov, 742 N.E.2d 453, 461 (Ind. 2001).

To prove the blowout coils were the cause of the incident, ArcelorMittal offered at trial the expert testimony of Robinson and Dr. Jur. Robinson is an electrical engineer and Dr. Jur is a mechanical engineer with EDT, the business of which is consulting "in matters involving loss or damage . . . to figure out why it happened and the individuals involved in it." Tr. at 3987. Robinson described the incident reconstruction performed by EDT in August 2007, as a result of which they concluded that "something, some unknown factor in the control system had come to [sic] play in the original incident, other than the broken blowout coils of which we were aware at the time." Tr. at 4574-75. Because of that, Robinson was asked to examine the electrical circuit for the crane's control system. Although the mechanical brakes should have been closed or engaged when the controller was in neutral, as it was when the ladle began descending, Robinson determined the mechanical brakes were open or disengaged during the descent. "So it's clear that to start the whole chain of events going, [Verta] had to have put the controller into a lowering position . . . ." Tr. at 4597. After conducting an analysis of the circuitry within an exemplar controller,[7] Robinson concluded "that in addition to the broken blowout coils, that there had to be a problem in the controller that resulted in both the 11L and the 21L contactors to close." Tr. at 4605. Both of those contactors are controlled by the C5 switch, "[s]o that had to be the component that was malfunctioning."

---

[7] Because the components of the original controller had been replaced and discarded, WESCO also claims this exemplar was not sufficiently similar to the original to support the testimony arising from its use. However, WESCO did not object to the exemplar or to the testimony about it and the differences were explored with Robinson during his testimony.

Tr. at 4606.  Asked to state the opinion he reached as a result of his investigation into the events that resulted in the incident, Robinson testified:

> First of all, it is my opinion that the operator put the crane into a lowering position and then returned the control to neutral and, at that point, the uncontrolled descent began.
> Secondly, it is my opinion that the uncontrolled descent was due to the malfunction of three components consisting of the two fractured blowout coils and the switch—the C5 switch in the controller.

Tr. at 4619.  On cross-examination, Robinson agreed that his opinion relied on certain assumptions or deductions he made, including that the operator had put the controller into a lowering position and that the two screws holding the C5 switch were loose.

Dr. Jur testified similarly, that if the blowout coils are fractured and the C5 switch in the controller is loose, when the operator puts the controller in neutral, "there's no braking at all . . . .  So [the ladle's] going to come down at a fast pace and that was the explanation of this case.  That was the – that was the circumstances that, we figured out resulted in that fall."  Tr. at 4214-15.  He also testified that based on the condition of the blowout coils following their removal from the contactor, they had been fractured for some time.  Tr. at 4028.

WESCO vigorously contended at trial and continues to contend on appeal that this testimony and these opinions were inadmissible because there is no evidence to support the two assumptions upon which they were based.  WESCO contends Verta never told anyone he had put the controller in lowering position before returning it to neutral prior to the descent, so the evidence directly contradicts the assumption that he had done so.  Moreover, WESCO contends that if loose screws were "occasionally" found in a

21

controller, more often than not they were tight. Further, WESCO contends there is no evidence that they were loose at the time of the incident, as no one testified they saw loose screws when the controller was repaired after the incident.

Verta testified at trial in general regarding his experience operating the crane that after passing the bridge, "we start to bring the ladles down. . . . [by] us[ing] the main hoist controls . . . [for] a few seconds, to make sure I am level with the furnace." Tr. at 1983-84. When asked if that was his habit or practice when operating the crane, Verta replied it was and that he could not think of any times when he did not follow that habit. Tr. at 1985. With regard to Verta's testimony and his actions during the ladle's descent, WESCO's expert, Charles Landy, noted that in order for EDT's theory of causation to work, the crane had to be lowering, not raising. He noted that in his investigation, he did not see any evidence to substantiate the assumption that Verta lowered the controller, but also did not uncover any evidence that contradicted it. Tr. at 6402.

ArcelorMittal plant employees, including Pospychala, occasionally found loose screws in their regular maintenance of the controller. Pospychala testified that it was hard to see the screws because of the configuration of the crane cab, but "we pull the cover off and we try and see as best we can the tips. And then feel our way down and there's screws in there that hold the tips to the main structure, and we give them—we give them a turn now and then to make sure they're not falling out or anything . . . ." Tr. at 3222. Assuming from this there could be loose screws that impacted the switches in the controller, Robinson conducted a test on an exemplar controller. The results explained all of the observations of the parties during and after the incident.

22

We cannot say the trial court abused its discretion in admitting this evidence, because it was helpful in explaining to the jury how the incident could have happened and the engineering methodology behind the opinions was reliable. The consistency of the opinions with the entirety of the testimony was for the jury to decide. Even if the trial court had erred, however, WESCO must show prejudice in order for any error in admitting evidence to be reversible. Although the full picture of the cause of the incident was complicated and required mechanical and electrical engineering assessments of the entire braking system, there was additional evidence which could have led the jury to find the blowout coils were a substantial factor in causing the incident. After an initial inspection of the crane revealed nothing visibly wrong, ArcelorMittal personnel operated the crane and replicated the incident: a full ladle descended even when the controller was in neutral. ArcelorMittal personnel then inspected the contactors and discovered the blowout coils in both were fractured. After both blowout coils were replaced and with no other repairs, the crane held a full ladle properly. Although subsequent testing showed the incident was caused by the two fractured blowout coils plus the faulty switch, there was evidence independent of the expert testimony that the blowout coils contributed to the incident. A motion for judgment on the evidence should be granted only when there is insufficient evidence supporting an issue. Because there was sufficient evidence supporting the causation issue even in the absence of the expert testimony, the trial court did not commit reversible error in denying WESCO's motion for judgment on the evidence.

## II. Spoliation of Evidence

WESCO claims it was denied a fair trial because the trial court did not sanction ArcelorMittal for failing to preserve or document critical components of the crane's braking system, leaving WESCO unable to inspect those components in preparing its defense. WESCO claims this issue raises "important public policy considerations regarding a sophisticated party's duty to preserve evidence, or at least warn a potentially liable party before destroying evidence." Brief of Appellant at 43. WESCO identifies the following evidence it claims was critical but not preserved: 1) the intact controller in use on April 28; 2) the condition of the dynamic braking contactors on April 28; 3) the blowout coils while in place within the contactors on April 28; and 4) the condition of the mechanical brakes on April 28. See Brief of Appellant at 44.

When ArcelorMittal discovered the fractured blowout coils after its initial testing of the crane, it took the blowout coils out of the contactors and preserved them. That initial testing indicated to plant personnel that the blowout coils were the likely problem. WESCO was able to inspect the blowout coils during its investigation and preparation. However, ArcelorMittal did not photograph or otherwise document the blowout coils in place within the contactors before removing them. The controller was disassembled after the incident, and several internal components were replaced and discarded. The condition of the controller at the time of the incident was not documented. Additionally, the condition of the contactors and the mechanical brakes at the time of the incident was not documented. While the crane was down due to the incident, ArcelorMittal employees performed routine periodic maintenance on the brakes.

24

Because WESCO was unable to examine these additional components, it sought sanctions against ArcelorMittal. The trial court ultimately declined to impose any sanction due to the failure to preserve evidence and also declined to instruct the jury regarding any inferences that could be made because of it. Significantly, WESCO was free to question witnesses regarding the discarded or altered parts and was, as it acknowledged at oral argument, able to argue to the jury regarding its inability to inspect them in their original state and why that was important. See Tr. at 6993-94 (WESCO stating in its closing argument, "[T]here's no accident here, by anybody's calculation, without problems in the controller. That's why all these things about the controller are so important. . . . Those alleged two loose screws that were in the controller are part of the whole guts of the thing that we know was pitched shortly after this incident. Who's [sic] controller was it? It wasn't WESCO's. It was the plant's controller and the plant's responsibility to maintain it. Who pitched its parts? It wasn't WESCO. It was the plant.").

WESCO filed a motion for sanctions pursuant to Trial Rule 37 due to ArcelorMittal's spoliation of evidence from the crane. Trial Rule 37 provides a trial court with the tools to enforce compliance with the discovery process. Pfaffenberger v. Jackson Cnty. Reg'l Sewer Dist., 785 N.E.2d 1180, 1183 (Ind. Ct. App. 2003). The rule provides that a trial court may impose sanctions, including dismissal, if a party fails to comply with an order to compel discovery. Whitaker v. Becker, 960 N.E.2d 111, 115 (Ind. 2012). The determination of the appropriate sanction is left to the trial court's discretion, and we review only for an abuse of that discretion. Id. Although there is no

25

apparent order to compel which WESCO seeks to enforce, it is undisputed that the evidence at issue has been altered or otherwise disposed of and ArcelorMittal could not produce it.[8]

Before even reaching the issue of possible sanctions, there must first be a determination that spoliation of evidence occurred. Spoliation of evidence is the intentional destruction, mutilation, alteration, or concealment of evidence. Glotzbach v. Froman, 854 N.E.2d 337, 338 (Ind. 2006) (quotation omitted). In Gribben v. Wal-Mart Stores, Inc., our supreme court noted that "[c]ourts uniformly condemn spoliation. '[I]ntentional destruction of potential evidence in order to disrupt or defeat another person's right of recovery is highly improper and cannot be justified.'" 824 N.E.2d 349, 354 (Ind. 2005) (quoting Coleman v. Eddy Potash, Inc., 905 P.2d 185, 189 (N.M. 1995)) (emphasis added).

> As for sanctions if spoliation is found, our supreme court has noted that
>
> [p]otent responses . . . exist under Indiana Trial Rule 37(B) authorizing trial courts to respond to discovery violations with such sanctions "as are just" which may include, among others . . . dismissal of all or any part of an action . . . .

Id. at 351. In Howard Reg'l Health Sys. v. Gordon, 952 N.E.2d 182 (Ind. 2011), our supreme court quoted from a "widely cited opinion" about the factors weighing on the appropriate sanction:

---

[8] ArcelorMittal contends that WESCO's acknowledgement that the trial court had discretion in ruling on its motion for sanctions is a judicial admission precluding its argument on appeal that dismissal was warranted. "A judicial admission is a formal stipulation that concedes any element of a claim or defense." Luphahla v. Marion Cnty. Sheriff's Dep't, 868 N.E.2d 1155, 1159 (Ind. Ct. App. 2007) (citation omitted). It relieves the opposing party of the duty to present evidence of that claim or defense. Lystarczyk v. Smits, 435 N.E.2d 1011, 1014 (Ind. Ct. App. 1982). WESCO's statement to the trial court that it had discretion in imposing sanctions is not an admission related to a claim or defense. It is simply an acknowledgement of the law. It does not preclude WESCO from arguing the trial court abused the discretion it had.

26

> Determining whether sanctions are warranted and, if so, what they should include, requires a court to consider both the spoliating party's culpability and the level of prejudice to the party seeking discovery. Culpability can range along a continuum from destruction intended to make evidence unavailable in litigation to inadvertent loss of information for reasons unrelated to the litigation. Prejudice can range along a continuum from an inability to prove claims or defenses to little or no impact on the presentation of proof. A court's response to the loss of evidence depends on both the degree of culpability and the extent of prejudice. Even if there is intentional destruction of potentially relevant evidence, if there is no prejudice to the opposing party, that influences the sanctions consequence. And even if there is an inadvertent loss of evidence but severe prejudice to the opposing party, that too will influence the appropriate response, recognizing that sanctions (as opposed to other remedial steps) require some degree of culpability.

Id. at 189-90 (quoting Rimkus Consulting Grp., Inc. v. Cammarata, 688 F.Supp.2d 598, 613 (S.D. Tex. 2010)). Further, "[i]t is well-established in Indiana law that intentional first-party spoliation of evidence may be used to establish an inference that the spoliated evidence was unfavorable to the party responsible." Gribben, 824 N.E.2d at 351.

Here, the trial court deferred ruling on WESCO's pre-trial motion for sanctions due to spoliation until after hearing all of the evidence. At the conclusion of the presentation of evidence, the trial court declined to impose any discovery sanctions upon finding no intentional conduct by ArcelorMittal that amounted to spoliation. Although the evidence was intentionally altered or discarded—in the sense that an ArcelorMittal employee acted purposefully in rebuilding the controller and throwing the parts away— the trial court specifically found that ArcelorMittal did not "intentionally destroy evidence that they knew was evidence at the time they destroyed it." Tr. at 6731-32 (emphasis added). The trial court ruled similarly with respect to WESCO's proffered adverse inference instruction: "I can't say that [ArcelorMittal] knew, at the time these

27

parts were discarded, that they would later become so important to a determination of this case. . . . There's nothing in front of me to suggest that [ArcelorMittal] actively suppressed evidence in this case." Tr. at 6813. WESCO contends the trial court applied the wrong standard in ruling on its motion for sanctions, repeatedly asserting at oral argument that the trial court required a showing of "criminal intent" by ArcelorMittal. Our review of the entirety of the trial court's explanation for its rulings does not reveal it imposed any such standard.[9]

The trial court was "boots on the ground" for nearly six years of litigation and four weeks of trial, during which it was able to evaluate the degree of ArcelorMittal's culpability and the extent of prejudice to WESCO, and it found no evidence that ArcelorMittal destroyed the evidence for an improper purpose. Both parties' witnesses agreed it would have been better for their evaluation to have the additional evidence, and without doubt, that is true. See Tr. at 4644-45 (ArcelorMittal's expert Robinson testifying that it "[w]ould have been wonderful" to have the original controller and without it, he was required to deduce "within a reasonable degree of engineering certainty" that there were loose screws to explain the incident); Tr. at 6365-66 (WESCO's expert Clifford Bigelow testifying that the only thing he wanted to do as part of his investigation that he was unable to do was "look at the interior of the main hoist controller that was installed in the crane at that time."). But neither party was able to say

---

[9] In discussions regarding WESCO's proffered adverse inference instruction, the trial court did state, "They picked [the controller] up, they rebuilt it and threw the parts away. That part, they intentionally threw the parts away. But did [they] do it, for want of a better word, with criminal intent." Tr. at 6798. However, the trial court used that phrase once in the multiple and lengthy discussions about this issue and it is clear that the trial court was simply trying to articulate the difference between the intent to discard something and the intent to spoliate evidence.

conclusively what the lost evidence would have shown because ArcelorMittal disposed of it before even it could inspect it.

WESCO describes ArcelorMittal and its insurer as "sophisticated parties," see Brief of Appellant at 43, but the employees who worked on the crane in the immediate aftermath of the accident—the first responders, so to speak—were not sophisticated parties; they were crane operators and maintenance men who were primarily interested in getting the plant back up and running as soon as possible. Once the blowout coils were replaced and the crane was operating normally again, they believed the problem had been found and fixed. As evidence of ArcelorMittal's culpability with respect to the rebuilt controller in particular, WESCO notes that the initial testing was done by ArcelorMittal on April 29, and the blowout coils were removed that day. By May 1, ArcelorMittal notified its insurer of the incident, and on May 2, an adjuster emailed ArcelorMittal, stating, "It appears that your own investigation into the cause is well advanced–as you mentioned it is important that as much evidence is retained as possible at this time . . . ." App. at 752. By May 4, the adjuster and EDT were on site. Rutledge testified that he disassembled the controller within four or five days of the incident, noting the crane was still being inspected at that time.

WESCO also asserts that ArcelorMittal had a policy of retaining evidence related to plant incidents and that Pospychala wanted to keep the parts from the controller when they were replaced because he knew of the policy but Rutledge threw them out anyway. On cross-examination by WESCO, Marwitz testified:

29

Q: As a result of your inspection of the main hoist controller, you asked the maintenance people to replace it or rebuild it; is that right?
A: Yes.
Q: And they did that; correct?
A: Yes.
Q: They replaced the parts or the guts of the controller; correct?
A: Yes.
Q: Did you tell them to save the parts when they were doing that repair?
A: I didn't specifically look them in the eyes and tell them that, no.
Q: In fact, you didn't think you had to tell them to preserve the parts; did you?
A: No, I didn't.
Q: You expected them to preserve the parts; didn't you?
A: Yes.
Q: It's general practice just to hold the parts that are removed for someone to look at; right?
A: Yes.

Tr. at 3896-97. Rutledge testified Marwitz asked him to look into the controller "about the fourth day" after the incident. Tr. at 3092. The fourth day after the incident would have been approximately May 2, 2006. At some point that day, the adjuster communicated with someone at ArcelorMittal about the investigation and the need to retain evidence, but there is no evidence that was communicated to the men on the floor. Marwitz testified to a "general practice" to hold parts that were removed as part of an investigation. But he asked Rutledge to look at the controller not as part of the investigation specifically but because he thought it was "sloppy" and could use some work in general. Rutledge believed the blowout coils had been the problem, and so when he fixed the controller, he cursorily inspected it but was not looking for anything specific to the crane malfunction. Though WESCO believes that Pospychala retained the parts because he knew to keep them, Marwitz did not identify a specific company policy and Pospychala himself was never questioned about why he wanted to retain the parts.

30

Rather, Rutledge testified that Pospychala thought the parts were in good condition and presumably could be used again not because he thought the plant might need to see them as part of the investigation. Rutledge threw them away because they were extraneous parts they no longer needed and the plant did not have the space to keep old parts.

All of this happened within the first week after the incident. The "sloppiness" of the controller was a concern early on. However, there is no evidence the concern was over it being a possible cause of the malfunction when Marwitz asked Rutledge to work on it because the unmodified controller had operated the crane properly after the blowout coils were replaced. EDT was on site as early as May 4, 2006, but it did not realize there had to be a factor besides the fractured blowout coils at play until its on-site testing in August of 2007.

Based upon this sequence of events, we cannot say the trial court erred in finding that ArcelorMittal did not realize the importance of the evidence for some time after it was altered and/or discarded and therefore did not act with intent to prejudice WESCO in this litigation. Moreover, because the evidence was destroyed before either side had a chance to inspect it, the prejudice to the parties is approximately equal: although WESCO could not conclusively prove the screws on the controller were tight on the day of the incident, neither could ArcelorMittal conclusively prove they were loose. Both sides were required to prove their theory of causation by logical inference and deduction. Therefore, the trial court did not abuse its discretion in declining to sanction ArcelorMittal for the failure to preserve the evidence, especially with the extreme sanction of dismissal.

With respect to WESCO's request to instruct the jury that a party's failure to produce evidence in its control may establish an inference that the evidence was unfavorable to that party, the question is not whether we would have given the instruction had we been in the trial court's shoes but whether the trial court abused its discretion in denying it. In reviewing a trial court's decision to refuse a tendered instruction, we will reverse if the instruction: (1) correctly states the law; (2) is supported by the evidence in the record; and (3) is not covered in substance by other instructions. See Wal–Mart Stores, Inc. v. Wright, 774 N.E.2d 891, 893 (Ind. 2002). The decision to deny a tendered jury instruction is largely left to the sound discretion of the trial court and we will review the trial court's decision only for an abuse of that discretion. Tucker v. Harrison, 973 N.E.2d 46, 56 (Ind. Ct. App. 2012), trans. denied. Here, the trial court found the instruction tendered by WESCO was not supported by evidence that ArcelorMittal had actively suppressed evidence it knew or suspected had a bearing on the case. But because WESCO had been able to question witnesses about that evidence and make argument about why it was important and why its unavailability mattered, the issue was clearly before the jury. We cannot say the trial court abused its discretion in refusing to give an adverse inference instruction.

### III. Product Identification

WESCO claims the trial court abused its discretion in admitting expert testimony about the source of the blowout coils in the contactors on the date of the incident and that absent that testimony, ArcelorMittal failed to offer any evidence to prove that both

32

blowout coils were supplied by WESCO. Therefore, WESCO claims the admission of this evidence was reversible error.

The admission of expert testimony is within the discretion of the trial court, Armstrong, 775 N.E.2d at 365, and reversal is not appropriate unless any abuse of discretion causes prejudice, Franciose, 907 N.E.2d at 144.

During Dr. Jur's testimony, he was asked about his investigation into the "root cause" of the incident, or as Dr. Jur described it, figuring out "what, who and why, where – but really who – is all this traceable to." Tr. at 4238. His investigation included

> search[ing] through the documents that underlie the arrival of these parts into the plant . . . purchase orders, and delivery documents, and such as that. . . . [T]his is literally something I do on just about every file like this . . . . Sometimes I will assign this role to another person in the company, depending upon the level of complexity of the pieces of equipment that are involved. . . .
> This particular case, I chose to do it by myself [because] it became apparent to me that the range of these documents, and where they were coming from, and how it related to when things got at the plant and how they were installed and so forth, relative to the reconstruction of the incident, I elected to take over the task entirely myself and do it.

Tr. at 4241-42. Dr. Jur was expected to testify based upon his review of these records that both contactors and blowout coils in place on April 28 were supplied by WESCO. WESCO objected to the testimony:

> For the purposes of this hearing, outside the presence of the jury, we'll stipulate that, that's what we understand his ultimate opinion to be [that the blowout coils came from WESCO]. However, that does not negate the fact that it's not expert testimony under Rule 702. He has not established that this requires any scientific, technical or other specialized knowledge. This was something that was already done by a plant guy.

Tr. at 4251; see also Tr. at 4264 ("And this is cumulative in nature and it's certainly not expert testimony under Rule 702."). Ultimately, the trial court allowed Dr. Jur's testimony:

> I'm allowing Dr. Jur's opinions under Rule 702. I do find that he has specialized knowledge about this because of his review of all of the documents, and the testimony, and the other things that come to bear on the question of the source of these blowout coils. So, in that sense, it is an expert. It's not scientific. It's not technical, but it does involve some specialized knowledge which he has, which I also find will be helpful to the jury in understanding this case and making a reasoned determination of the source of these parts.

Tr. at 4375.

WESCO contends the trial court abused its discretion in admitting Dr. Jur's testimony because expert testimony was not required to prove the blowout coils came from WESCO, and further, any specialized knowledge Dr. Jur had with regard to this issue was gained solely from this case and is insufficient to qualify him as an expert in the first place. WESCO claims prejudice in that allowing Dr. Jur to testify as an expert gave added gravitas to his conclusion and without his testimony, there was no proof connecting both contactors and the blowout coils therein to WESCO.

Whether or not expert testimony was "required" to prove the source of the blowout coils, it is apparent that because of how WESCO labeled parts and how ArcelorMittal documented the procurement, storage, and use of parts in the plant, the source was far from straightforward. The jury could not simply look at documentary evidence itself and determine that ArcelorMittal had received a given part from a given supplier, installed that part on the crane on a certain date, and the part remained there

34

until the date of the incident. And although WESCO focuses on Dr. Jur's lack of knowledge about ArcelorMittal's specific record-keeping prior to this case, it is clear that he has conducted similar reviews in other cases which allowed him to look at the evidence in this case and make sense of it. The trial court did not abuse its discretion in finding Dr. Jur had "specialized knowledge" that would assist the trier of fact.

Additionally, had Dr. Jur fallen short of being qualified as an expert for this purpose, he could still have testified as a skilled witness pursuant to Evidence Rule 701:

> [T]he testimony of an observer, skilled in an art or possessing knowledge beyond the ken of the average juror[,] may be nothing more than a report of what the witness observed, and therefore, admissible as lay testimony. This type of evidence is not a matter of scientific principles governed by Evid. R. 702(b); rather, it is a matter of the observations of persons with specialized knowledge.
>
> Such witnesses possessing specialized knowledge are often called skilled witnesses or skilled lay observers. A skilled witness is a person with a degree of knowledge short of that sufficient to be declared an expert under Ind. Evid. R. 702, but somewhat beyond that possessed by the ordinary jurors. Skilled witnesses not only can testify about their observations, they can also testify to opinions or inferences that are based solely on facts within their own personal knowledge.

Linton v. Davis, 887 N.E.2d 960, 975 (Ind. Ct. App. 2008) (citations and quotation marks omitted), trans. denied. Under Indiana Evidence Rule 701, a skilled witness may provide an opinion or inference that is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Ind. Evid. R. 701. The requirement that the opinion be "helpful" means, in part, that the testimony gives substance to facts that are difficult to articulate. Hanson v. State, 704 N.E.2d 152, 155 (Ind. Ct. App. 1999). Testimony under Indiana Rule 701 "generally needs only rise to a relatively low bar in order to be admissible." Hawkins v.

35

*State*, 884 N.E.2d 939, 945 (Ind. Ct. App. 2008), trans. denied. Dr. Jur personally reviewed ArcelorMittal's records regarding the purchasing and installation of the contactors and blowout coils in addition to personally inspecting the equipment. His testimony about the source of the blowout coils was rationally based upon his own perceptions and helped to explain how ArcelorMittal determined the blowout coils originated with WESCO. Thus, his testimony would have been admissible under Rule 701 even if he had not qualified as an expert under Rule 702.

And finally, even if the trial court had abused its discretion in admitting Dr. Jur's testimony, WESCO acknowledged at trial that his testimony was cumulative and therefore its contention that without the testimony there is no evidence linking WESCO to the fractured blowout coils is dubious. Marwitz testified regarding the source of the contactors and blowout coils as well. After the incident, Marwitz conducted an inventory and identified ten contactors in the plant's possession at the relevant time. He was able to account for each and determined the two on the crane at the time of the incident came from WESCO. Tr. at 3768; see Exhibit 1984. Apparently there was a blowout coil failure in one of the crane's contactors in February 2006 and Marwitz could not say for sure whether just the blowout coil or the entire contactor was replaced. His testimony, then, though clear that the contactor had been obtained from WESCO, was unclear about whether the blowout coil therein was also obtained from WESCO. Pospychala, however, filled in that gap when he testified that he had personally replaced the entire contactor. Even if Dr. Jur's testimony on product identification should not have been admitted, WESCO was not harmed.

IV. Proximate Cause and Foreseeability

WESCO alleges that it was entitled to summary judgment or judgment on the evidence because the combination of events leading to the ladle spill was not foreseeable as a matter of law and therefore WESCO was not the proximate cause of ArcelorMittal's damages. WESCO's argument in this regard seems to encompass two separate concepts: foreseeability of the chain of events causing the incident and foreseeability of the damages that were caused by the incident.

As noted above, the elements of a breach of contract claim are: the existence of a contract, the defendant's breach of the contract, and the plaintiff's damages as a result of the breach. Fowler, 612 N.E.2d at 600. The plaintiff has the burden of demonstrating that the defendant's breach was a substantial factor contributing to the damages. Hopper v. Colonial Motel Props., Inc., 762 N.E.2d 181, 187 (Ind. Ct. App. 2002), trans. denied. Causation generally, and proximate cause in particular, is usually a question of fact for the jury's determination. Correll v. Ind. Dep't of Transp., 783 N.E.2d 706, 707 (Ind. Ct. App. 2002), trans. denied. The issue of proximate cause was in fact submitted to the jury via the "responsible cause" instruction tendered by WESCO and quoted in the facts above. ArcelorMittal contends and we agree that WESCO's challenge is actually to the sufficiency of the evidence supporting the jury's proximate cause determination.

In order to recover on a breach of contract claim, the alleged breach must be a cause in fact of the plaintiff's loss. Fowler, 612 N.E.2d at 601. Where an injury arising from the breach of contract may have resulted from multiple causes, we do not recognize "comparative causation": the test is not whether the breach was the only cause or

37

whether other causes may have contributed to the loss, but whether the breach was "a substantial factor in bringing about the harm." Id. at 602. It would not have been unreasonable based upon the evidence for the jury to determine that the fractured blowout coils, though not the sole factor, were a substantial factor in bringing about ArcelorMittal's loss. Without the fractured blowout coils, the other events would not have combined to cause the crane's brakes to fail and the ladle to descend, ultimately tipping and starting a fire when molten iron spilled out.

To the extent WESCO argues the other events were intervening or superseding causes, those are generally negligence concepts, as the trial court noted during the instruction conference. See Tr. at 6866 (trial court noting with respect to WESCO's tendered instruction that "I'm having trouble with that. This is a tort concept, not a breach of contract concept."). In fact, the tendered instruction apparently referred to "negligence" and "fault," and was rewritten to use the terms "breach of contract" and "causation" before it was given to the jury. See Tr. at 6871-74. Our research has disclosed no Indiana cases that discuss intervening or superseding cause in the context of a breach of contract action and WESCO has not cited one. However, to the extent those concepts are applicable in this situation, we note that the action of someone or something other than the alleged tortfeasor that affects the chain of causation is an intervening cause; it becomes a superseding cause breaking the chain of causation if it was not foreseeable. Conder v. Hull Lift Truck, Inc., 435 N.E.2d 10, 14 (Ind. 1982).

> Under the doctrine of superseding causation, a chain of causation may be broken if an independent agency intervenes between the defendant's negligence and the resulting injury. The key to determining whether an

38

intervening agency has broken the original chain of causation is to determine whether, under the circumstances, it was reasonably foreseeable that the agency would intervene in such a way as to cause the resulting injury. When assessing foreseeability in the context of proximate cause, courts evaluate the particular circumstances of an incident after the incident occurs.

Scott v. Retz, 916 N.E.2d 252, 257 (Ind. Ct. App. 2009) (citations, quotations, and alterations omitted).  The jury was instructed as WESCO wished on this issue.  The jury reasonably could have determined that none of the individual events that contributed to this incident were independent, unrelated causes.  Even WESCO characterizes this incident as a "convergence of events."  See, e.g., Br. of Appellant at 63.  Just as it is true that if there were no loose switches in the controller, the fracture of the blowout coils alone would not have caused the brake failure, the opposite is also true:  if there was no fracture of the blowout coils, the loose switches alone would not have caused the malfunction.[10]  The causes had to work in concert.  Because causation is generally a matter to be determined by the trier of fact, the trial court did not err in submitting the issue to the jury.  Moreover, there was sufficient evidence of causation from which the jury could reasonably determine that the fractured blowout coils supplied by WESCO were a substantial factor in bringing about ArcelorMittal's loss.

As to damages, the measure of damages in a breach of contract action is limited by what is reasonably foreseeable at the time the parties entered into the contract, not what is known at the time of the breach; the test is an objective one.  Berkel & Co. Contractors, Inc. v. Palm & Assoc., Inc., 814 N.E.2d 649, 658-59 (Ind. Ct. App. 2004).

_____

[10]  This is in fact the result of the August 2007 test EDT conducted.  EDT operated the crane with no blowout coils in place and the crane still held a full ladle.  It was because of this that EDT concluded there had to be another element involved which led to the analysis of the electrical system in the controller.

"Foreseeability means that which it is objectively reasonable to expect, not merely what might conceivably occur." Belle City Amusements, Inc. v. Doorway Promotions, Inc., 936 N.E.2d 243, 249 (Ind. Ct. App. 2010) (citation omitted). "Conversely, damages which do not arise naturally from the breach of contract, or which are not within the contemplation of the parties at the time the contract is entered into, are not recoverable." Rogier v. Am. Testing & Eng'g Corp., 734 N.E.2d 606, 614 (Ind. Ct. App. 2000), trans. denied; see Belle City Amusements, Inc., 936 N.E.2d at 249-50 (holding that lost profits beyond 2009 for vendor's breach of contract to supply a festival midway in 2008 and 2009 were not reasonably foreseeable as a consequence of the breach); Hopper, 762 N.E.2d at 187-88 (damages for personal injury caused to motel patron when the person in the room above accidentally discharged a gun into her room were not reasonably foreseeable at the time the injured party and the motel entered into a contract for rental of the room). "[T]he possibility that a particular injury is not a foreseeable result of a particular breach of contract should not completely foreclose a litigant from proving the breach and recovering those damages which he can show to be a foreseeable consequence of the breach." Wells v. Stone City Bank, 691 N.E.2d 1246, 1249 (Ind. Ct. App. 1998), trans. denied. Thus, the focus should not be on whether the additional events contributing to the incident were foreseeable at the time of contracting, as WESCO frames the issue, but on whether the elements of ArcelorMittal's damages were foreseeable at the time of contracting as a consequence of the breach.

The issue of foreseeability of damages is generally to be determined by the trier of fact. Bob Anderson Pontiac, Inc. v. Davidson, 155 Ind. App. 395, 403, 293 N.E.2d 232,

236 (1973). Even if ArcelorMittal had not been entitled to the full measure of damages it sought, it was entitled to present evidence of the breach and resulting damages and have the trier of fact determine what was reasonably foreseeable at the time of contracting. Therefore, the trial court appropriately declined to enter judgment for WESCO as a matter of law and instead submitted the issue to the jury.

A jury could reasonably infer that it was foreseeable to the parties to this sale that a component to be used in the braking system of a crane at a steel mill, if faulty, could lead to brake failure. Given that the cranes were used to transport molten iron, the jury could also reasonably infer that it was foreseeable a brake failure could lead to significant damage and loss if the load was spilled. Moreover, ArcelorMittal points to the purchase order terms and conditions accompanying the contactor purchases that state WESCO would indemnify ArcelorMittal "from and against any and all loss, costs, damage, expense and claims on account of any and all damange to, loss to, or destruction of any ArcelorMittal property arising directly or indirectly out of the . . . contactors supplied by WESCO pursuant to the purchase orders." Brief of Appellee at 65; see Exhibit 19-8A, 535-4, 258-6A. We will not disturb the jury's decision regarding causation.

## V. Subsequent Remedial Measures

WESCO also claims the trial court erred in precluding it from admitting evidence of subsequent remedial measures taken by ArcelorMittal. It argues this is reversible error because ArcelorMittal was allowed to admit evidence that the blowout coils were replaced following the incident, the crane operated normally thereafter, and no similar incidents have occurred since April 28, 2006, leaving the jury with the impression that

41

there were no other incidents because the fractured blowout coils had been replaced.[11]

WESCO wished to present evidence that in addition to replacing the blowout coils after

the incident, ArcelorMittal implemented a policy that the auxiliary hook be kept above

the ladle and reinstalled a spring return-to-center safety feature on the controller.

Indiana Evidence Rule 407 provides:

> When after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Pursuant to this rule, evidence of post-incident remedial measures is generally

inadmissible. Hagerman Constr., Inc. v. Copeland, 697 N.E.2d 948, 954 (Ind. Ct. App.

1998), trans. denied. Evidence of a subsequent remedial measure may, however, be

admitted when offered for purposes other than proving culpable conduct. Id. The

principal concerns underlying Rule 407 are that permitting proof of subsequent remedial

measures will deter a party from taking action that will prevent future injuries and doubt

that subsequent measures have probative value in proving omission or misconduct.

Strack & Van Til, Inc. v. Carter, 803 N.E.2d 666, 670-71 (Ind. Ct. App. 2004). The

decision to admit or exclude evidence lies within the sound discretion of the trial court

---

[11] WESCO states, "The court allowed [ArcelorMittal] to present unrebutted evidence and argument that after the incident, and after the Blowout Coils were replaced, [ArcelorMittal] did not experience any other uncontrolled Ladle descents. (Tr. 1560)." Br. of Appellant at 67. It is true that at page 1560 of the transcript, Kevin McCabe, an ArcelorMittal employee who was on site the night of the incident, testified that he was not aware of any other time, going all the way to the day of his testimony, when molten iron had spilled onto the floor of the facility. It is also true that after the incident, the blowout coils were replaced. But McCabe did not testify regarding the blowout coils at all, let alone their replacement, so the temporal connection is not as direct as WESCO would make it seem.

and is afforded great discretion on appeal.  Id. at 670.  We will not reverse that decision absent a showing of abuse of that discretion.  Id.

McCabe testified that the only place a crane operator could not keep the auxiliary hook was beneath the dump lug on the ladle but otherwise he could keep it above or below as long as it was also away from the dump lug.  He also testified that he was not aware of any other time that a ladle had spilled its contents onto the floor of the plant. ArcelorMittal employee David Whitworth testified similarly.  WESCO argued ArcelorMittal had opened the door to evidence that after the incident, ArcelorMittal's policy was changed to require crane operators to keep the auxiliary hook above and away from the ladle.  WESCO asserted it was entitled to introduce this evidence in order to impeach testimony that it was not unsafe to keep the hook below the dump lug and also to correct a misimpression the jury might have that the operation of the crane had nothing to do with the incident.  The trial court disagreed and WESCO was not allowed to inquire about the policy change.  WESCO did, however, elicit testimony that some crane operators preferred to keep the auxiliary hook above the dump lug and further, WESCO's expert testified that the incident would not have happened if the auxiliary hook had been placed above.  As for the spring return-to-center mechanism, the trial court did not allow WESCO to specifically ask Whitworth if the spring return-to-center mechanism had been reinstalled on the controllers, but there was evidence before the jury from other witnesses that the mechanism had been absent from the controllers for many years prior to the incident and that the mechanism was on the controllers after the incident.

43

Because there was evidence regarding the spring return-to-center mechanism, the trial court did not abuse its discretion in excluding additional, cumulative evidence regarding that revision and WESCO was not prejudiced by the exclusion. With respect to the policy change regarding placement of the auxiliary hook in relation to the dump lug, WESCO argued impeachment and feasibility as the "other purposes" for its inquiry. However, no one testified that it was not feasible to place the auxiliary hook above the dump lug, only that it was not required to do so. And as to impeachment, WESCO argued that ArcelorMittal witnesses "testified that it is safe to have the auxiliary hook below, there's nothing unsafe about it. We should be entitled to put on evidence that it, in fact, isn't safe, and they know it isn't safe because they changed the procedure afterwards." Tr. at 1660. WESCO also asserted that "[t]he jury is entitled to know they've changed their procedures, and that's why there haven't been any other accidents." Id. at 1661. This is the definition of attempting to prove fault through evidence of subsequent remedial measures, and such evidence is inadmissible pursuant to Rule 407 for that purpose. Further, there is no direct correlation as WESCO asserts. Prior to the incident, crane operators could have the auxiliary hook above or below the ladle, just not directly beneath the dump lug. If they could have it below, it stands to reason there were times prior to April 28, 2006, when it was below, and yet there had been no ladle spills until this incident. Accordingly, the placement of the auxiliary hook alone could not be the cause. The trial court did not abuse its discretion in excluding evidence of ArcelorMittal's policy change regarding the placement of the auxiliary hook.

## VI. Production of Documents

44

Certain portions of documents produced by ArcelorMittal in discovery were redacted and other documents were withheld altogether on the basis of work product and/or attorney-client privilege. WESCO filed a motion to compel the production of documents that the trial court granted in part and denied in part.[12] WESCO contends the trial court may have abused its discretion by denying access to some or all of the documents.

"Due to the fact-sensitive nature of discovery matters, the ruling of the trial court is cloaked in a strong presumption of correctness on appeal." Mutual Sec. Life Ins. Co. by Bennett v. Fidelity and Deposit Co., 659 N.E.2d 1096, 1103 (Ind. Ct. App. 1995), trans. denied. A trial court has broad discretion in ruling on discovery issues, and we will reverse only where it is apparent the trial court abused that discretion. Childress v. Buckler, 779 N.E.2d 546, 554 (Ind. Ct. App. 2002). Further, we will not reverse a trial court discovery order without a showing of prejudice. Pioneer Lumber Inc. v. Bartels, 673 N.E.2d 12, 15 (Ind. Ct. App. 1996), trans. denied; Ind. Trial Rule 61.

With limited exception, the trial court determined that the redacted/withheld material was protected by the work product and/or attorney-client privilege. As the party asserting a privilege in response to a discovery request, ArcelorMittal had the burden to prove the applicability on a document-by-document basis. Howard v. Dravet, 813 N.E.2d 1217, 1221-22 (Ind. Ct. App. 2004). The attorney-client privilege arises out of the provisions of Indiana Code section 34-46-3-1 and "protects against judicially

---

[12] WESCO sought certification of the trial court's orders regarding these documents for the purpose of pursuing an interlocutory appeal, but the trial court denied that motion.

45

compelled disclosure of confidential information regardless of whether the information is to be disclosed by way of testimony or by court-ordered compliance with a discovery request . . . ." Brown v. Katz, 868 N.E.2d 1159, 1165-66 (Ind. Ct. App. 2007). Indiana Trial Rule 26(B)(3) defines the work-product privilege and provides:

> a party may obtain discovery of documents and tangible things otherwise discoverable . . . and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative . . . only upon a showing that the party seeking discovery has a substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

(Emphasis added.) A document is gathered in anticipation of litigation if it can fairly be said that the document was prepared or obtained because of the prospect of litigation. Nat'l Eng'g & Contracting Co., Inc. v. C & P Eng'g & Mfg. Co., Inc., 676 N.E.2d 372, 377 (Ind. Ct. App. 1997). Products of investigation are work product because their subject matter relates to the preparation, strategy, and appraisal of the strengths and weaknesses of an action, or to the activities of the attorneys involved. Id. at 376.

An investigation by an insurance company does not automatically require a finding that the investigation was conducted in anticipation of litigation. Burr v. United Farm Bureau Mut. Ins. Co., 560 N.E.2d 1250, 1254 (Ind. Ct. App. 1990), trans. denied. And the fact the plaintiff has hired an attorney also does not mandate a finding that an investigation was undertaken in anticipation of litigation. Id. However, consultation between the insurance company and an attorney during the investigation is an important factor that generally weighs in favor of finding a work product privilege. Id. An insurance company cannot reasonably argue that the entirety of its claim file is

46

accumulated in anticipation of litigation when it has a duty to investigate, evaluate, and make a decision regarding an insured's claim. Id. at 1255.

The trial court noted in its initial order on this discovery issue that "[i]n review of these documents, this Court is mindful [of caselaw stating] that a document produced by an insurer for the purpose of arriving at a claim decision, even though it was produced after litigation was reasonably anticipated, was prepared for concurrent purposes, and therefore not work product." App. at 105. During a later hearing on this matter, the trial court stated:

> I spent an enormous amount of time going through these documents. It struck me, particularly, with regard to the withheld documents, that these really went to the heart of the attorney client relationship, to the retention of a consulting expert to investigate things, and, regardless of when they were produced, they were clearly in my view developed with antic – with litigation in mind. . . .
> The second thing that struck me is that, probably, with regard to most of the information contained in those documents, it would be flushed out during the course of discovery, in any event, in some way, shape or form. . . .

Tr. at 230-31.

Obviously, not knowing the content of the redacted/withheld documents, WESCO can only surmise that the trial court erred in ruling they were protected and that it has been prejudiced by their non-disclosure. Accordingly, WESCO filed a motion asking this court to conduct an *in camera* review of the non-redacted documents ArcelorMittal filed with the trial court in order to determine whether the trial court's ruling was proper and to assess the prejudice to WESCO if not. We granted this motion at the oral argument and

47

subsequently ordered the trial court to file those documents with the Clerk of this Court for transmittal to the panel.

Following our own review of the documents, the trial court's reasoning for its denial of the motion to compel, and the course of proceedings thereafter, we are of the opinion that the trial court did not abuse its discretion in denying WESCO's motion to compel production because the protected documents were gathered in anticipation of litigation or contained confidential information. Further, WESCO was not prejudiced by the denial because, as the trial court surmised, much of the information contained in the redacted and withheld documents was gleaned during further discovery, including depositions of relevant witnesses and the exchange of exhibits.

## VII. Prejudgment Interest

WESCO claims the trial court erred in awarding prejudgment interest to ArcelorMittal should we affirm the judgment in ArcelorMittal's favor, as we have. An award of pre-judgment interest in a breach of contract action is warranted "if the amount of the claim rests upon a simple calculation and the terms of the contract make such a claim ascertainable." Noble Roman's Inc. v. Ward, 760 N.E.2d 1132, 1140 (Ind. Ct. App. 2002). "The test for determining whether an award of pre-judgment interest is appropriate is whether the damages are complete and may be ascertained as of a particular time." Id. An award of prejudgment interest is proper when the trier of fact does not have to exercise judgment in order to assess the amount of damages. Kummerer v. Marshall, 971 N.E.2d 198, 201 (Ind. Ct. App. 2012), trans. denied. Therefore, "an

award of pre-judgment interest is generally not considered a matter of discretion." Noble Roman's Inc., 760 N.E.2d at 1140.

Examples of cases where prejudgment interest is appropriate include those for breach of contract when the damages were principal payments made under a promissory note, Tracy v. Morell, 948 N.E.2d 855, 867 (Ind. Ct. App. 2011); the amount of a mechanics' lien for a contractor's unpaid bills for a remodeling project, Hayes v. Chapman, 894 N.E.2d 1047, 1054-55 (Ind. Ct. App. 2008), trans. denied; and an amount stipulated to at a damages hearing, Noble Roman's, Inc., 760 N.E.2d at 1141. In these cases, the amount of damages was clear and did not require any interpretation or judgment on the part of the trier of fact.

WESCO contends any award of prejudgment interest was in error because the jury exercised discretion in arriving at a damages amount substantially different from what ArcelorMittal claimed. ArcelorMittal claimed it suffered damages in the total amount of $46,301,777: $12,410,777 in property damage, $3,632,000 in extra expenses, and $30,259,000 in lost margins on lost sales. The jury returned a verdict in the general amount of $36,134,477. In its post-trial motion, ArcelorMittal sought prejudgment interest at the rate of eight percent per annum on the entire amount of the jury award from the time it filed its complaint until the judgment was entered. App. at 4927-28. The trial court awarded prejudgment interest at the rate of six percent per annum on $12,410,777, the amount ArcelorMittal claimed to have expended to repair its facility. App. at 93.

ArcelorMittal contends the parties stipulated to the cost of repairing ArcelorMittal's facility and that ArcelorMittal actually incurred that expense. The stipulation, however, was:

> The parties agree and stipulate to the authenticity and admissibility of Exhibits 467, 468, 469, 470, 471, 472 and 473. These exhibits contain invoices reflecting the amounts spent by the plant for repairs after the April 28, 2006, incident. These invoices total $12,410,777. . . . By entering into this stipulation and agreement, the parties have not reached an agreement that these amounts represent damages that are recoverable under Indiana law.

Tr. at 4959-60. Counsel for WESCO explained, "We agree that that's what the amount is. We're not agreeing that those amounts were reasonable, and we're not agreeing that they are the measure of damages." Tr. at 4960. The parties stipulated that the invoices ArcelorMittal submitted regarding the cost of repair totaled $12,410,777. They did not stipulate that the cost of repair was reasonable or that the total cost was an appropriate measure of damages. In essence, WESCO stipulated to the admissibility of invoices in order to relieve the need for ArcelorMittal to call a witness to identify and testify to the content of each invoice. Contrary to ArcelorMittal's position, the amount of damages attributable to repair were not uncontested.

It appears the jury did exercise judgment in arriving at a damages amount, as the verdict is approximately ten million dollars less than the total damages claimed by ArcelorMittal. Further, it appears the jury did not award as a lump sum the entire amount of property damage claimed by ArcelorMittal—$12,410,777—because it awarded damages of $36,134,477. With just a general verdict, it is impossible to say, as ArcelorMittal advocates, that there was "a single fixed component of its total damages

. . . which was readily ascertainable" on which prejudgment interest could properly be granted. Brief of Appellee at 85. Rather, the verdict requires some interpretation. Accordingly, ArcelorMittal was not entitled to prejudgment interest on any of the verdict, and the trial court erred in granting prejudgment interest on any component thereof.

## VIII. Damages Instruction

Finally, we need not address WESCO's issue regarding the trial court's instruction to the jury regarding the appropriate measure of damages. WESCO acknowledges this would only be an issue if it prevailed and was granted a new trial. Br. of Appellant at 70. Because we have found no reversible error in any of the issues previously raised by WESCO, this issue is moot.

## Conclusion

We conclude the trial court's sole error was in awarding prejudgment interest to ArcelorMittal. We reverse that award and remand to the trial court to amend the final judgment accordingly. In all other respects, the judgment of the trial court is affirmed.

Affirmed in part; reversed and remanded in part.

BAKER, J., and BRADFORD, J., concur.